**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 16, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SHANE COX,

    Defendant - Appellant.

_____

STATE OF KANSAS,

    Intervenor - Appellant.

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JEREMY KETTLER,

    Defendant - Appellant.

_____

STATE OF KANSAS,

    Intervenor - Appellant.

_____

No. 17-3034

No. 17-3035

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 6:15-CR-10150-JTM)**

_____

Paige A. Nichols, Assistant Federal Public Defender (Melody Brannon, Federal Public Defender, with her on the briefs), Topeka, Kansas, for Defendant–Appellant Shane Cox.

Joseph W. Miller of Law Offices of Joseph Miller, LLC, Fairbanks, Alaska (Robert J. Olson, William J. Olson, Jeremiah L. Morgan, Herbert W. Titus of William J. Olson, P.C., Vienna, Virginia, with him on the briefs) for Defendant–Appellant Jeremy Kettler.

Derek Schmidt, Attorney General of Kansas, Jeffrey A. Chanay, Chief Deputy Attorney General, Toby Crouse, Solicitor General of Kansas, Dwight R. Carswell and Bryan C. Clark, Assistant Solicitors General, Topeka, Kansas, for Intervenor–Appellant.

Elizabeth H. Danello, Attorney, Appellate Section, Criminal Division, Department of Justice, Washington, D.C. (Stephen R. McAllister, United States Attorney, District of Kansas, Jared S. Maag, Assistant United States Attorney, District of Kansas, Kenneth A. Blanco, Acting Assistant Attorney General, and Trevor N. McFadden, Deputy Assistant Attorney General, Department of Justice, Washington, D.C., with her on the brief) for Plaintiff–Appellee.

_____

Before **HARTZ**, **SEYMOUR**, and **PHILLIPS**, Circuit Judges.

_____

**PHILLIPS**, Circuit Judge.

_____

This is a tale of two laws: the National Firearms Act (NFA), 26 U.S.C. §§ 5801–5872, which requires the registration of statutorily defined firearms, and Kansas's Second Amendment Protection Act (SAPA), ch. 100, 2013 Kan. Sess. Laws vol. 1 500–03 (codified at Kan. Stat. Ann. §§ 50-1201 to -1211 (2014)), which purports to exempt any personal firearm, firearm accessory, or ammunition manufactured, owned, and remaining within Kansas's borders from "any federal law, . . . including any federal firearm or ammunition registration program, under the

authority of congress to regulate interstate commerce." Kan. Stat. Ann. § 50-1204(a). In 2014, these two laws intersected when the government prosecuted two Kansas men, Shane Cox and Jeremy Kettler, for violating the NFA by manufacturing (in Kansas), transferring (in Kansas), and possessing (in Kansas) several unregistered firearms. A jury found them guilty of most (though not all) of the charges.

Now, Cox and Kettler appeal their convictions, though they don't dispute that their actions ran afoul of the NFA.[1] First, they challenge the NFA's constitutionality, alleging that the statute is an invalid exercise of congressional power and an invasion of the Second Amendment right to bear arms. Second, they challenge the district court's ruling that their reliance on the SAPA, which they understood to shield Kansas-made and -owned firearms from federal regulation, provided no defense to charges that they violated the NFA. Kettler further asks us to see his prosecution as the product of a dispute between Kansas and the federal government over the SAPA, a dispute that unjustly swept him up (along with Cox, though Cox hasn't joined this argument). We also granted Kansas's request to participate in these appeals as needed to defend the SAPA from a Supremacy Clause challenge.

---

[1] Cox and Kettler each appealed individually (in cases nos. 17-3034 and 17-3035, respectively), but because their appeals raise overlapping issues, we granted the government leave to file a single response brief. We consider Cox's and Kettler's appeals companioned cases (though we never formally consolidated them), separately submitted to the same panel for oral argument and decision.

We reject Cox's and Kettler's challenges to their convictions (without addressing the SAPA's constitutionality). Exercising jurisdiction under 28 U.S.C. § 1291, we therefore affirm the district court's judgments.

## BACKGROUND

In 2014, Shane Cox ran Tough Guys, an army-surplus store in Chanute, Kansas. Inside the store, near a glass display case filled with homemade silencers, Cox had posted a copy of the SAPA (which the Kansas legislature passed a year earlier) for his customers to read. *See* Kan. Stat. Ann. §§ 50-1201 to -1211. Drawing on the Second, Ninth, and Tenth Amendments to the U.S. Constitution, as well as the Kansas Constitution's bill of rights, the SAPA purports to protect from federal interference the availability of all firearms, firearm accessories (including silencers[2]), and ammunition made, sold, and kept "within the borders of Kansas." Kan. Stat. Ann. §§ 50-1202, 50-1203(b), 50-1204(a), 50-1206 to -1208; *see also* Kan. Const. Bill of Rights § 4 (guaranteeing an individual right to bear arms).

The display caught the attention of Jeremy Kettler, an army veteran from neighboring Humboldt who'd walked into Tough Guys to look around. Cox was in

---

[2] The Kansas law uses the term "sound suppressors" instead of "silencers." *See, e.g.*, Kan. Stat. Ann. § 50-1203(b). Kettler, too, prefers "suppressor" to "the more colloquial term 'silencer,'" explaining that "while such a device will 'suppress' the noise of a gunshot to below a level that would cause hearing damage," it "come[s] nowhere close to 'silencing' the sound of a gunshot, as is depicted in television and movies." Kettler's Opening Br. at 10 n.5. But the NFA uses "silencer," as does Cox. 26 U.S.C. § 5845(a)(7); *see also, e.g.*, Cox's Opening Br. at 2. So for consistency's sake (and without expressing an opinion on either term's accuracy), we adopt "silencer" throughout this opinion.

4

the store, so Kettler asked him about the law and the silencers. Neither Cox nor Tough Guys held a federal firearms license, but Cox believed that as a result of the SAPA, he could avoid the "red tape" of federal firearms regulations as long as the silencers never left Kansas. Cox R. vol. 3 at 292:9–11. Kettler bought one of Cox's silencers and later praised it (and Tough Guys) in a Facebook post.

In December 2014, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) learned that Tough Guys was selling unregistered silencers and started an investigation. Within a year, federal prosecutors secured a grand jury indictment against Cox and Kettler, charging them with thirteen crimes linked to Cox's firearms-manufacturing venture, Kettler's patronage of it, and the ensuing investigation. Count 1 alleged that Kettler had knowingly and willfully made false statements "[d]uring a [f]ederal [i]nvestigation," in violation of 18 U.S.C. § 1001. Cox R. vol. 1 at 28. Counts 2, 3, and 4 each charged Cox with possessing an unregistered firearm—a destructive device, a short-barreled rifle, and another destructive device,[3] respectively—in violation of 26 U.S.C. § 5861(d). Count 5 accused both Cox and Kettler of conspiring, under 18 U.S.C. § 371, to violate the NFA by building and selling an unregistered silencer. Counts 6, 7, 8, 9, and 11 charged Cox with five violations of 26 U.S.C. § 5861(e) for transferring five silencers—four to recipients

---

[3] The NFA defines a destructive device as "any explosive, incendiary, or poison" gas, bomb, grenade, rocket, mine, or similar device, as well as "any combination of parts either designed or intended" to be converted into such a device. 26 U.S.C. § 5845(f). Prosecutors alleged that Cox had kept some "grenade husks," accelerant, and other components in his workshop. Cox R. vol. 3 at 221:14.

5

identified by their initials plus a fifth to "an undercover law enforcement officer." Cox R. vol. 1 at 34. Count 10 accused Cox of making a silencer in violation of 26 U.S.C. § 5861(f). Count 12 alleged that between June 20, 2014, and February 4, 2015, Cox had "engaged in the business of manufacturing and dealing in" silencers in violation of 26 U.S.C. § 5861(a). Cox R. vol. 1 at 34. And count 13 charged Kettler with possessing a silencer in violation of 26 U.S.C. § 5861(d).

Cox and Kettler each pleaded not guilty and moved to dismiss the NFA-based charges,[4] claiming—for slightly different reasons—that the SAPA shielded them from criminal liability for running afoul of federal firearms regulations.[5] Cox argued that because of the SAPA, enforcing the NFA against him would exceed the federal government's constitutional authority and usurp "powers reserved to the States" in violation of the Tenth Amendment. Cox R. vol. 1 at 39. Kettler, in turn, asserted entrapment by estoppel. By enacting the SAPA, argued Kettler, the Kansas legislature had "specifically" told him that federal laws didn't apply to his Kansas-made and -owned suppressor, and his reasonable reliance on Kansas's promise rendered the federal prosecution unjust. *Id.* at 69.

The district court rejected both arguments in one written order. *See United States v. Cox* (*Cox I*), 187 F. Supp. 3d 1282, 1285–88 (D. Kan. 2016). First it ruled,

---

[4] Kettler didn't contest count 1, the false-statement charge.

[5] Cox and Kettler also each moved "to join in any and all motions and memoranda" filed by the other. Cox R. vol. 1 at 62; Kettler R. vol. 1 at 65. The district court granted their motions.

based on Supreme Court and circuit precedent, that the NFA was a valid exercise of Congress's taxing power. *Id.* at 1285–87. Next the court threw out Kettler's entrapment-by-estoppel defense, reasoning that because state officials lack the power to construe or enforce federal law, it wasn't reasonable for Kettler to rely on the Kansas legislature's representations about the reach of federal law. *Id.* at 1287–88. The court therefore denied the motions to dismiss the indictment. *Id.* at 1288.

A few months later, the government submitted a pre-trial motion asking the court to "find that any defense based on Kansas' enactment of the [SAPA] is not a valid legal defense." Cox R. vol. 1 at 106. And to keep the Kansas statute from confusing matters for the jury, the government sought "a prohibition on any mention" of the SAPA. *Id.* vol. 3 at 16:21–22. The court initially granted the government's request, but then tempered that ruling in response to Kettler's offer of proof, which convinced the court that "references to [the] SAPA [we]re interwoven with the evidence of the alleged offenses."[6] *Id.* vol. 1 at 194. The court maintained that the SAPA "provide[d] no defense" to the charged offenses, *id.* at 193, but it declined to "excise" the SAPA from the evidence and predicted that some mention of the law would be admissible to contextualize the charged offenses, *id.* at 194. And if (as the

---

[6] Kettler's proffer of SAPA-related evidence included: (1) that Cox handed out copies of the SAPA to customers, including Kettler, who bought silencers; (2) that Kettler knew about the SAPA and relied on it; (3) that an ATF agent who'd talked to Kettler on the phone learned that Kettler "was confused as to the investigation into Cox and his silencers because of the existence of the State law"; and (4) that Cox had informed Kettler of the SAPA when the two discussed silencers. Cox R. vol. 1 at 133.

court assumed) the SAPA surfaced at trial, the court promised to instruct jurors on how to consider the law.

The state of Kansas, meanwhile, moved to intervene. Federal law gives a state the right to intervene "[i]n any action, suit, or proceeding in a court of the United States . . . wherein the constitutionality of any statute of that State affecting the public interest is drawn in question." 28 U.S.C. § 2403(b). So far in this case, the district court had neither ruled nor been asked to rule on the SAPA's constitutionality. Yet considering the breadth of the words "drawn into question," the court decided to grant Kansas's motion to intervene. Cox R. vol. 1 at 197 (quoting 28 U.S.C. § 2403(b)). Kansas couldn't present evidence or directly participate in the trial, but the court's order allowed the state "to be heard on any subsequent rulings that implicate[d] the constitutionality of [the] SAPA." *Id.*

The cases proceeded to a joint trial in November 2016. After Cox rested on the third day, and again after Kettler rested on the fourth, both moved for judgments of acquittal. The court ultimately dismissed the conspiracy charge against both defendants, having seen "no evidence . . . of a conspiracy between Mr. Cox and Mr. Kettler," and the false-statement charge against Kettler. Cox R. vol. 3 at 565. Yet it found that the government had presented sufficient evidence to send the remaining counts to the jury.

The jury began deliberating on the fourth day, and it returned a verdict later the same day, finding Cox not guilty of the destructive-device-possession counts (2 and 4) but guilty of the remaining eight counts: unlawfully possessing a short-

8

barreled rifle in count 3; unlawfully transferring silencers in counts 6, 7, 8, 9, and 11; unlawfully making a silencer in count 10; and unlawfully engaging in business as a dealer or manufacturer of silencers in count 12. The jury also found Kettler guilty of the remaining count against him, unlawfully possessing a silencer in count 13.

The day before the court submitted the case to the jury, Kettler (joined by Cox) filed a motion "to dismiss the present prosecution." Cox R. vol. 1 at 218. They argued that because the NFA provisions at issue—26 U.S.C. §§ 5861 and 5871, which lay out prohibitions and penalties—had "become merely regulatory punishment," the provisions exceeded Congress's power to tax and, in fact, usurped power that the Tenth Amendment reserved to the states. *Id.* at 220. The motion doesn't mention the Second Amendment, but after Kansas submitted a response defending the SAPA on Second Amendment grounds, Kettler filed a reply relying almost exclusively on that amendment and urging the court to find that the NFA unconstitutionally infringed the right to bear arms.

The district court addressed both arguments in a January 2017 written order. *United States v. Cox* (*Cox II*), 235 F. Supp. 3d 1221, 1222–23 (D. Kan. 2017). The court reiterated its conclusion, based on Supreme Court precedent, that the NFA is a valid exercise of Congress's taxing power. *Id.* at 1225; *accord Cox I*, 187 F. Supp. 3d at 1285, 1287. And "if the NFA is otherwise consistent with the Constitution and constitutes a valid exercise of Congress's taxing power," the court reasoned, "then it does not run afoul of the Tenth Amendment." *Cox II*, 235 F. Supp. 3d at 1225. Next, the court concluded that none of the NFA provisions that applied to Cox and Kettler

9

infringed their Second Amendment rights. *Id.* at 1227–28. The court therefore denied the motion to dismiss. *Id.* at 1229.

The following month, the district court held a sentencing hearing. At that hearing, the court took into account Cox's and Kettler's reliance on the SAPA and gave them the benefit of that reliance. In lieu of prison time, the court sentenced Cox to two years' probation and Kettler to one year's.

Cox and Kettler appealed their convictions, and Kansas "move[d] to participate as a party" in Cox's appeal, citing 28 U.S.C. § 2403(b) and Fed. R. App. P. 44(b). State of Kan.'s Mot. to Participate as Party at 1–2, *United States v. Cox*, No. 17-3034 (10th Cir. May 9, 2017). The SAPA "ha[d] played a prominent role in [Cox's] case," Kansas noted, and the federal government had "argued at every turn that the [SAPA] is 'clearly preempted by federal law' and 'invalid.'" *Id.* at 2 (quoting Cox R. vol. 1 at 87, 108). Kansas therefore asked to submit briefs, on the same schedule as Cox, defending the SAPA's constitutionality. No one opposed the motion, so we granted it, and Kansas filed two briefs.

## DISCUSSION

Though Cox and Kettler challenge their convictions, neither denies that he failed to abide by the NFA's rules: Kettler possessed an unregistered silencer; Cox possessed an unregistered short-barreled rifle and dealt in unregistered silencers. They strike instead at the NFA itself, arguing that the Act exceeds the constitutional bounds of Congress's power and violates their Second Amendment rights. In the alternative, even if the NFA passes constitutional muster, they contend that their

10

reliance on the SAPA mitigates their culpability for violating the NFA—a defense that, they claim, the district court erroneously kept from the jury.[7] We address the NFA's constitutionality first; then we turn to the SAPA and how (if at all) it affected Cox's and Kettler's culpability.

## A. The Constitutionality of the National Firearms Act

Cox and Kettler claim that the NFA—at least as applied to their conduct[8]—suffers two constitutional infirmities, both fatal. We review each challenge de novo.

---

[7] Kansas, in turn, briefed these issues:

1. Does the National Firearms Act, specifically 26 U.S.C. § 5861, preempt the Second Amendment Protection Act?
2. Did the District Court err in holding that the Second Amendment does not protect possession of silencers?

Br. of Intervenor State of Kan. at 1 (Br. of Kan.). As for the first issue, though, preemption isn't relevant here, and we needn't address the SAPA's constitutionality. And as for the second issue, it's not clear how the Second Amendment's protection of silencers would advance the SAPA's constitutionality. As a result, we don't directly engage any of Kansas's arguments.

[8] Kettler isn't clear about whether he's mounting a facial or an as-applied challenge to the NFA, while Cox specifically claims that the NFA "as applied" exceeds Congress's powers and violates the Second Amendment. Cox's Opening Br. at 36, 52. It's harder to prevail on a facial challenge—unlike an as-applied challenge, a facial challenge fails if "at least some" constitutional applications of the challenged statute exist. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 457 (2008) (quoting *Schall v. Martin*, 467 U.S. 253, 264 (1984)). And Kettler focuses on the NFA's transfer provisions, such as 26 U.S.C. § 5811, rather than take on the statute as a whole. So, in the absence of an indication that we should do otherwise, we treat both Cox's and Kettler's constitutional challenges as challenges to the NFA as it applied to them. (We also note that the failure of an as-applied challenge shows that the statute has "at least some" constitutional applications, spelling the end of any facial challenge.)

*United States v. Reese*, 627 F.3d 792, 799 (10th Cir. 2010) (quoting *United States v. Dorris*, 236 F.3d 582, 584 (10th Cir. 2000)).

### 1. Is the National Firearms Act a Valid Exercise of Congressional Power?

Cox and Kettler argue that the NFA exceeds Congress's power. We agree with the government, though: the NFA is a valid exercise of Congress's taxing power, as well as its authority to enact any laws "necessary and proper" to carry out that power. U.S. Const. art. I, § 8, cls. 1, 18.

Among other enumerated powers, Article I of the Constitution gives Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States," *id.* cl. 1, and "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Power[]," *id.* cl. 18.

And on its face, the NFA is a taxing scheme. The statute collects occupational and excise taxes from businesses and transactions involving listed firearms—which include short-barreled rifles, silencers, and destructive devices. *See* 26 U.S.C. § 5845(a) (defining "firearm"). Importers, manufacturers, and dealers of these firearms must pay a yearly tax of $500 to $1,000. *Id.* § 5801. And each time one of these firearms is made or transferred, the statute levies a $200 tax. *Id.* § 5811 ("Transfer tax"); *id.* § 5821 ("Making tax"). But the NFA does more than lay taxes. To carry out the taxing scheme, it also mandates the registration of every importer, manufacturer, and dealer, *see id.* § 5802, and of every firearm made, *see id.* § 5822, or transferred, *see id.* § 5812. And to ensure compliance, the statute has teeth: the

12

failure to abide by any of its rules is a crime punishable by up to ten years in prison (or a fine, or both). *Id.* §§ 5861 ("Prohibited acts"), 5871 ("Penalties").

The Supreme Court addressed Congress's taxing-clause authority to enact the NFA eighty-one years ago, when a firearms dealer indicted for failing to pay the (then $200) annual dealer tax challenged the statute's constitutional basis with an argument similar to Cox and Kettler's. *See United States v. Sonzinsky*, 300 U.S. 506, 511 (1937). The dealer conceded that the taxing power allowed Congress to tax firearms dealers, yet he "insist[ed]" that the tax at issue was "not a true tax, but a penalty imposed for the purpose of suppressing traffic in a certain noxious type of firearms." *Id.* at 512. But the Constitution, according to the dealer, had reserved regulation of these firearms to the states, not to the federal government. *Id.* He concluded that the NFA revealed its "penal and prohibitive character" by cumulatively taxing importers, manufacturers, dealers, and transferors. *Id.*

The Supreme Court rejected the dealer's challenge, refusing to conclude that the NFA—on its face a taxing measure—exceeded congressional power "by virtue of its deterrent effect on the activities taxed." *Id.* at 513–14. "Every tax is in some measure regulatory," explained the Court, and "a tax is not any the less a tax because it has a regulatory effect." *Id.* at 513. Unlike the child-labor tax struck down in the *Child Labor Tax Case*, the NFA tax wasn't "a penalty resorted to as a means of enforcing [other] regulations." *Id.* (citing *Bailey v. Drexel Furniture Co.* (*The Child Labor Tax Case*), 259 U.S. 20, 35 (1922)). Rather, though the NFA contained registration provisions, those provisions were "obviously supportable as in aid of a

13

revenue purpose." *Id.* And because the $200-per-year dealer tax produced "some revenue," the Court refused to ponder Congress's motives in imposing it or to estimate its regulatory effect. *Id.* at 514. In sum, since "it [wa]s not attended by an offensive regulation, and since it operate[d] as a tax," the Court concluded that the NFA's taxing scheme was "within the national taxing power." *Id.*

Cox and Kettler urge us to limit *Sonzinsky*'s holding to the NFA of 1937, a statute that they claim no longer exists, and to reconsider the constitutional premise for today's NFA. According to Cox and Kettler, the statute that *Sonzinsky* upheld "has morphed, over more than eight decades, to the point that the current NFA registration system bears virtually no resemblance to a measure designed to collect revenue." Kettler's Opening Br. at 11–12.

Today, Cox and Kettler contend, the NFA is "far more of a gun-*control* measure than a gun-*tax* measure." Cox's Opening Br. at 53. They point out that since 2003, the ATF has administered the NFA from the Justice Department instead of the Treasury Department, where the ATF and its predecessor agencies spent the preceding 200 years. They note that as a result, the NFA—alone in the Internal Revenue Code—now falls outside the purview of the Treasury Secretary. And with this shift in oversight, they argue, today's NFA resembles the regulatory scheme struck down in the *Child Labor Tax Case*, which subjected employers "to inspection at any time not only by the taxing officers of the Treasury, the Department normally charged with the collection of taxes, but also by the Secretary of Labor and his subordinates, whose normal function is the advancement and protection of the

14

welfare of the workers." 259 U.S. at 37. Cox and Kettler thus conclude that the NFA, like that "so-called tax" on child labor, is really a penalty, outside Congress's taxing power. *The Child Labor Tax Case*, 259 U.S. at 37.

Which agency or agencies administer a tax, however, is but one indicator among several in the "functional approach" to whether that tax is really—for constitutional purposes—a tax. *See Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 565 (2012). And on that score, the child-labor "tax" in the *Child Labor Tax Case* had two more strikes against it: first, the tax imposed "a heavy exaction" on violators, equal to one tenth of a business's yearly net income; and second, the law included a scienter requirement, meaning that only knowing violators had to pay the tax. *The Child Labor Tax Case*, 259 U.S. at 36; *see also Sebelius*, 567 U.S. at 565–66. The sum of all three characteristics made "palpable" the law's "prohibitory and regulatory effect" and convinced the Court that the so-called tax was really a penalty, meant to stop child labor, and fell outside Congress's taxing-clause authority. *The Child Labor Tax Case*, 259 U.S. at 37, 39.

Yet Cox and Kettler don't contend that today's NFA exhibits either of the other penalty-like features of the child-labor "tax" in the *Child Labor Tax Case*. Nor need we assess which way those features point in this case, for we aren't starting from a blank slate in determining whether the NFA is a constitutional tax; we're starting from *Sonzinsky*. In upholding the NFA, *Sonzinsky* expressly distinguished the *Child Labor Tax Case* and similar decisions, in which "the [challenged] statute contain[ed] regulatory provisions related to a purported tax in such a way . . . that the

15

latter [wa]s a penalty resorted to as a means of enforcing the regulations." *Sonzinsky*, 300 U.S. at 513. The NFA, according to *Sonzinsky*, regulates only "in aid of a revenue purpose." *Id.*

Only six years ago, *Sebelius* reaffirmed the NFA's constitutional legitimacy, touting the statute's "obviously regulatory" tax on sawed-off shotguns as proof that "taxes that seek to influence conduct are nothing new" and remain valid exercises of the taxing power. 567 U.S. at 567 (citing *Sonzinsky*, 300 U.S. at 513); *see also id.* (explaining that even though the Affordable Care Act's individual mandate "seeks to shape decisions about whether to buy health insurance," it's still a valid exercise of the taxing power). And by itself, moving the NFA's administration from the Treasury Department to the Justice Department didn't so alter the balance between the statute's taxes and its regulatory provisions as to unmoor today's NFA from the statute deemed constitutional in *Sonzinsky* and cited with approval in *Sebelius*.

But Cox and Kettler's taxing-power argument has another angle. Noting that *Sonzinsky* upheld the NFA's dealer tax in large part because the tax produced "some revenue," they dispute that the administration of today's NFA raises *any* net revenue. *See* 300 U.S. at 514. Citing our decision in *United States v. Dalton*, 960 F.2d 121 (10th Cir. 1992), they claim that a statute that doesn't raise net revenue can't "be justified under Congress' power to **raise revenue**." Kettler's Opening Br. at 24.

The current registration process, they argue, is "structured to avoid generating revenue in as many instances as possible." *Id.* at 19. They claim that increasingly complex registration applications, background checks, and swelling (now months-

16

long) delays likely discourage many from even trying to register and pay NFA taxes. As for those willing to run that gantlet, Cox and Kettler note that the ATF denies the applications of would-be registrants whom federal law prohibits from buying firearms, meaning that "literally tens of millions of Americans are deemed ineligible to pay the NFA tax." Kettler's Opening Br. at 18 (citing 18 U.S.C. § 922(d), which makes it unlawful "for any person to sell or otherwise dispose of any firearm" to someone who falls into any of nine categories, including felons, *see id.* § 922(d)(1), and fugitives from justice, *see id.* § 922(d)(2)). And what's more, Congress hasn't raised the $200 transfer fee for silencers and short-barreled rifles since 1934—not even to keep pace with inflation[9]—so, argue Cox and Kettler, "it could be said that" the NFA's taxes are now "**productive of no net revenue**." *Id.* at 22.

But *Dalton* doesn't stand for the proposition that Cox and Kettler attribute to it: that "the taxing power can no longer be the constitutional basis for the NFA when the $5[10] and $200 NFA fees no longer raise net revenue." Kettler's Opening Br. at 24.

---

[9] Cox and Kettler recognize that Congress has raised the occupational taxes that importers, manufacturers, and dealers must pay.

[10] The NFA imposes a transfer tax of $5 "on any firearm classified as any other weapon under [26 U.S.C.] section 5845(e)." 26 U.S.C. § 5811(a). But the weapons listed in Cox's and Kettler's indictment—silencers, a short-barreled rifle, destructive devices—don't fall under § 5845(e)'s definition of "any other weapon." 26 U.S.C. § 5845. They are "firearms" taxed at $200 per transfer, *see* § 5811(a), so the $5 rate is irrelevant to Cox's and Kettler's as-applied challenges to the NFA.

17

That case addressed whether due process permitted Dalton's convictions for violating the NFA by possessing (26 U.S.C. § 5861(d)) and transferring (§ 5861(e)) an unregistered machinegun, when a separate law, 18 U.S.C. § 922(*o*), banned the possession and transfer of machineguns. *Dalton*, 960 F.2d at 122. To avoid running afoul of 26 U.S.C. § 5861(d) and (e), the NFA's transfer provision (§ 5812) required the transferor to pay a tax and apply to register the machinegun. *Dalton*, 960 F.2d at 122. But the transfer provision also required that applications to register illegal weapons be denied. *Id.* at 123. Section 922(*o*) thus made compliance with § 5861(d) and (e)'s registration requirements impossible, and we agreed with Dalton "that it violate[d] fundamental fairness to convict him for failing to do an act which everyone agree[d] he could not perform." *Dalton*, 960 F.2d at 123. Weakening the premise for Dalton's convictions still further, we reasoned that § 922(*o*) had "undercut the constitutional basis" of the NFA's machinegun-registration requirement. *Id.* at 124–25 (quoting *United States v. Rock Island Armory, Inc.*, 773 F. Supp. 117, 125 (C.D. Ill. 1991), *rejected by United States v. Ross*, 9 F.3d 1182, 1194 (7th Cir. 1993), *vacated*, 511 U.S. 1124 (1994)).[11] We noted that *Sonzinsky* had upheld the NFA's registration requirements as "solely in aid of collecting the tax," so when § 922(*o*)

---

[11] The Supreme Court returned *Ross* to the Seventh Circuit for reconsideration in light of the Court's intervening decision in *Staples v. United States*, 511 U.S. 600, 602 (1994), which interpreted 26 U.S.C. § 5861(d) to require a defendant to know that the weapon that he possessed exhibited features making it a "firearm" for NFA purposes. *Ross v. United States*, 511 U.S. 1124 (1994); *see also United States v. Ross*, 40 F.3d 144, 145 (7th Cir. 1994) (concluding, on remand, that failing to instruct the jury on this knowledge requirement warranted a new trial).

ended the registration and taxation of machineguns, it also removed "the constitutional base for those requirements—*i.e.,* the power to tax." *Id.* at 124. Dalton's convictions for possessing and transferring an unregistered machinegun in violation of § 5861(d) and (e), we concluded, were therefore "constitutionally infirm." *Id.* at 126.

As later decisions have made clear, the constitutional infirmity in Dalton's convictions resulted from 18 U.S.C. § 922(*o*)'s prohibition of the firearm at issue, which removed 26 U.S.C. § 5861's constitutional footing by making registration "a literal and legal impossibility." *United States v. McCollom*, 12 F.3d 968, 971 (10th Cir. 1993). Unless a separate statute criminalizes possession of a firearm, though, a due-process or taxing-power challenge to a § 5861(d) conviction is doomed to fail. *See id.* at 970–71 (concluding that, because no statute bans the registration of short-barreled shotguns, due process didn't bar McCollum's § 5861(d) conviction for possessing an unregistered sawed-off shotgun). That's so regardless of the practical difficulty or unlikelihood of registering the firearm—and regardless of how little revenue the tax generates. *See, e.g.*, *United States v. Berres*, 777 F.3d 1083, 1088 (10th Cir. 2015) (reasoning that the registration of flash bangs isn't a legal impossibility, and so rejecting a due-process challenge to Berres's § 5861(d) conviction for possessing one); *United States v. Eaton*, 260 F.3d 1232, 1236 (10th Cir. 2001) (reaching the same conclusion regarding Eaton's possession of a pipe bomb). And because Cox and Kettler point to no federal statutory ban on the

19

possession or transfer of the firearms at issue—silencers and short-barreled rifles—*Dalton* doesn't control this case.

Nevertheless, Cox and Kettler urge us to extend *Dalton* to this case by treating a lack of net revenue from NFA taxes on a weapon like a statutory ban on that weapon. As net revenue falls to zero, they argue, the NFA's taxing purpose disappears, leaving only its regulatory effect, and the statute's constitutional legitimacy crumbles.

They're correct that revenue mattered in *Dalton*, which reasoned that because of § 922(*o*)'s machinegun ban, the government collected none from the possession or transfer of machineguns. 960 F.2d at 125. Revenue also mattered in *Sonzinsky*, 300 U.S. at 514, which upheld the NFA because its dealer tax was "productive of some revenue," and in *Sebelius*, 567 U.S. at 564, which noted that the ACA's shared-responsibility payment bore "the essential feature of any tax: It produce[d] at least some revenue for the Government."

But in each case, the constitutional question hinged on *gross* revenue, and it set the bar low—"some" gross revenue. *See Minor v. United States*, 396 U.S. 87, 98 n.13 (1969) ("A statute does not cease to be a valid tax measure . . . because the revenue obtained is negligible . . . ."). Cox and Kettler direct us to no authority where a tax's *net* revenue (i.e., what's left after deducting expenses) affects its constitutional validity. Plus, as the government pragmatically puts it, "If the focus were on net revenue, then the Executive Branch could negate the constitutionality of a tax imposed by Congress simply through spendthrift enforcement." Br. for the

20

United States at 21. While Cox and Kettler contend that the $200 transfer tax on silencers "no longer raise[s] net revenue," they do not dispute that it raises *some* revenue. Kettler's Opening Br. at 24. That's all that *Sonzinsky* and *Sebelius* require (and what we deemed impossible in *Dalton*).

Accordingly, though times may have changed since the Court decided *Sonzinsky* in 1937, Cox and Kettler point to no differences, either in the NFA or in courts' understanding of the national taxing power, that justify departing from *Sonzinsky*'s conclusion that the NFA is a valid exercise of Congress's power. *See Citizens United v. FEC*, 530 F. Supp. 2d 274, 278 (D.D.C. 2008) ("Only the Supreme Court may overrule its decisions."); *see also Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) (explaining that courts of appeals should follow Supreme Court precedent that "has direct application in a case" even if that precedent "appears to rest on reasons rejected in some other line of decisions" and should "leav[e] to th[e] Court the prerogative of overruling its own decisions"). We therefore conclude that the NFA falls within Congress's power to tax.[12]

---

[12] Other circuits uniformly agree. *See, e.g., United States v. Spoerke*, 568 F.3d 1236, 1245–46 (11th Cir. 2009); *United States v. Vill. Ctr.*, 452 F.3d 949, 950 (8th Cir. 2006); *United States v. Lim*, 444 F.3d 910, 913–14 (7th Cir. 2006); *United States v. Thompson*, 361 F.3d 918, 921 (6th Cir. 2004); *United States v. Grier*, 354 F.3d 210, 215 (3d Cir. 2003); *United States v. Gresham*, 118 F.3d 258, 261–62 (5th Cir. 1997); *United States v. Dodge*, 61 F.3d 142, 145–46 (2d Cir. 1995); *United States v. Aiken*, 974 F.2d 446, 449–50 (4th Cir. 1992); *United States v. Giannini*, 455 F.2d 147, 148 (9th Cir. 1972).

## 2. Does the National Firearms Act Comport with the Second Amendment?

Cox and Kettler next challenge the NFA on the ground that it violates the Second Amendment. Both contend that their NFA convictions stem from activities that the Second Amendment protects—possessing short-barreled rifles and making, selling, transferring, and possessing silencers—yet their challenges then diverge. While Cox urges us to follow *District of Columbia v. Heller*, 554 U.S. 570, 595, 626 (2008), and to apply means–end scrutiny to the NFA, Kettler argues that under *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941), and *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943), the NFA impermissibly taxes the exercise of his constitutional right to bear arms.

We begin, as Cox suggests, with *Heller*, tracing the scope of the Second Amendment and asking whether it permits the NFA regulations at issue. Then we turn to Kettler's argument and consider the impact of the *Cox–Murdock* rule on our analysis.

### a. The Scope of the Second Amendment under *Heller*

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This amendment confers an individual right to keep and carry arms, but that doesn't mean that it gives everyone the absolute right to carry any weapon, in any manner, for any purpose. *Heller*, 554 U.S. at 595, 626.

The right to keep and carry arms, like other constitutional guarantees, has limits, and in *Heller*, the Court identified two venerable ones. *See id.* at 595, 626–27. First, since the nineteenth century, the Second Amendment has coexisted with a range of firearms regulations. *Id.* at 627 & n.26. *Heller* refused "to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 626–27. Second, the Court reasoned that "the historical tradition of prohibiting the carrying of dangerous and unusual weapons" supported limiting the Second Amendment's protection to weapons "in common use at the time" of ratification. *Id.* at 627 (internal quotation marks and citations omitted) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). That means, according to *Heller*, that "those weapons not typically possessed by law-abiding citizens for lawful purposes"—short-barreled shotguns, for instance—fall outside the scope of the amendment. *Id.* at 625; *see also Miller*, 307 U.S. at 178 ("[W]e cannot say that the Second Amendment guarantees the right to keep and bear [a short-barreled shotgun].").

Yet within these limits, the Second Amendment takes some firearm regulations "off the [constitutional] table." *Heller*, 554 U.S. at 636. The law at issue in *Heller*, the District of Columbia's total ban on handgun possession in the home, represents the archetype of an unconstitutional firearm regulation. *See id.* at 628–29. The law not only prohibited "an entire class of 'arms'" that Americans "overwhelmingly"

23

choose to keep and to use for "the core lawful purpose of self-defense," but it extended that prohibition "to the home, where the need for defense of self, family, and property is most acute." *Id.* at 628, 630. Such a ban, *Heller* concluded, "would fail constitutional muster" no matter what level of scrutiny the Court applied. *Id.* at 628–29 & 628 n.27. *Heller* thus highlighted some traits of an unconstitutional regulation, but it left open how future courts should sort the constitutional from the unconstitutional.

As Cox points out though, our decision in *United States v. Reese* interpreted *Heller* to "'suggest[] a two-pronged approach to Second Amendment challenges' to federal statutes." 627 F.3d 792, 800 (10th Cir. 2010) (quoting *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010), and citing *United States v. Skoien*, 614 F.3d 638, 641–42 (7th Cir. 2010) (en banc)). Under the two-pronged approach, the reviewing court first asks: Does the challenged law burden conduct within the scope of the Second Amendment's guarantee? *Id.* (quoting *Marzzarella*, 614 F.3d at 89). If not, then the inquiry ends there. *Id.* at 800–01 (quoting *Marzzarella*, 614 F.3d at 89). But if the law burdens protected conduct, then "[the court] must evaluate the law under some form of means-end scrutiny." *Id.* at 801 (alteration in original) (quoting *Marzzarella*, 614 F.3d at 89). The law is constitutional only if it survives that scrutiny. *Id.* (quoting *Marzzarella*, 614 F.3d at 89).

We agree with Cox that *Reese*'s two-pronged approach provides a workable means of evaluating his Second Amendment challenges to the NFA's regulation of (1) short-barreled rifles, (2) silencers, and (3) the making and selling of firearms. We

thus begin by asking whether each regulated activity falls within the scope of the Second Amendment's guarantee. *See Reese*, 627 F.3d at 800–01. (If we answer "yes," then we will address whether the NFA's regulation of that activity survives means–end scrutiny. *Id.* at 801.)

### i. Short-barreled rifles

Cox argues that because short-barreled rifles are neither unusual nor especially dangerous, possessing them falls within the Second Amendment's ambit. He asserts that legal uses of short-barreled rifles include "collecting, hunting, and home defense." Cox's Opening Br. at 48. And when it comes to the risk of violence, Cox claims that compared to *all* rifles (short- or long-barreled), "non-restricted pistols are far more commonly used in firearm-related crime." *Id.* at 49 (quoting James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 518 & n.161 (May 2017)).

That handguns may bear a higher correlation to crime than rifles do, however, implies nothing about whether short-barreled rifles, in particular, are dangerous and unusual. More telling is *Heller*'s conclusion that short-barreled shotguns—close analogues to short-barreled rifles—belong in that category of weapons not typically possessed by law-abiding citizens for lawful purposes and, therefore, not protected by the Second Amendment. 554 U.S. at 624–25 (discussing *Miller*, 307 U.S. at 178); *accord United States v. Artez*, 290 F. App'x 203, 208 (10th Cir. 2008) (noting that *Heller* expressly foreclosed Artez's argument that the Second Amendment protected his possession of a sawed-off shotgun). And since *Heller*, many courts have

25

explained that a long gun with a shortened barrel is both dangerous, because "its concealability fosters its use in illicit activity," and unusual, "because of its heightened capability to cause damage." *Marzzarella*, 614 F.3d at 95; *see also, e.g.*, *United States v. Amos*, 501 F.3d 524, 531 (6th Cir. 2007) (McKeague, J., dissenting) ("[A] sawed-off shotgun can be concealed under a large shirt or coat. . . . [T]he combination of low, somewhat indiscriminate accuracy, large destructive power, and the ability to conceal . . . makes a sawed-off shotgun useful for only violence against another person, rather than, for example, against sport game.").

Though these cases dealt with short-barreled shotguns, rather than short-barreled rifles, Cox has offered no meaningful distinction between the two. We need not opine on whether a sufficient factual record could be developed to distinguish short-barreled rifles from short-barreled shotguns. On the record and argument before us, we take our cue from *Heller* and conclude that the possession of short-barreled rifles falls outside the Second Amendment's guarantee.

### ii.    Silencers

Next, we turn to silencers, which both Cox and Kettler contend merit Second Amendment protection. They argue that silencers are in common use (more common, says Kettler, than handguns were in the District of Columbia when the Court decided *Heller*) and that they're very rarely used to commit crimes—"except on television and in the movies." Kettler's Opening Br. at 34. Further, they claim that silencers protect the shooter's (and bystanders') hearing and, "by reducing muzzle flinch and the disorientation that can follow a loud shot," can improve accuracy. Cox's Opening

26

Br. at 45. And because the alternative—donning earmuffs—takes up precious time and suppresses surrounding sounds, they argue that these hearing-protection and accuracy benefits make silencers particularly valuable for "the core lawful purpose of home defense." *See Heller*, 554 U.S. at 630.

But a more basic question remains: Even if silencers are commonly used by law-abiding citizens for lawful purposes, are they a type of instrument protected by the Second Amendment? According to *Heller*, "the Second Amendment extends, prima facie, to all instruments that constitute *bearable arms*." 554 U.S. at 582 (emphasis added). An instrument need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an "Arm[]." *Id.* at 581 (citing two dictionaries from the eighteenth, and one from the nineteenth, century). Then and now, that means, the Second Amendment covers "[w]eapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581 (alteration in original) (citations omitted). A silencer is a firearm accessory; it's not a weapon in itself (nor is it "armour of defence"). Accordingly, it can't be a "bearable arm" protected by the Second Amendment.[13]

---

[13] Though we needn't decide the issue, we note that the government cites authority concluding that silencers are dangerous and unusual, the type of "arm" traditionally excluded from the Second Amendment's protection. *See, e.g., United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) (finding silencers even more dangerous than machineguns, for "[s]ilencers . . . are not 'typically possessed by law-abiding citizens for lawful purposes,' and are less common than either short-barreled shotguns or machine guns" (quoting *Heller*, 554 U.S. at 625)); *United States*

27

Thus, because silencers are not "bearable arms," they fall outside the Second Amendment's guarantee.

### iii. Making and selling firearms

Finally, Cox argues that the Second Amendment protects the making and selling of silencers. For two reasons, however, we disagree.

As a threshold matter, *Heller* endorsed "laws imposing conditions and qualifications on the commercial sale of arms" as one of the limitations on the right to bear arms. 554 U.S. at 626–27. The NFA's requirements that firearms dealers and manufacturers register and pay taxes annually fit neatly into that category of "presumptively lawful regulatory measures." *Id.* at 627 n.26; *see* 26 U.S.C. §§ 5801 (imposing an annual tax of $500 to $1,000 on "every importer, manufacturer, and dealer in firearms"), 5802 (requiring "each importer, manufacturer, and dealer in firearms" to register every year with the Secretary of the Treasury). Those requirements, therefore, don't infringe the right to bear arms.

---

*v. Garnett*, 2008 WL 2796098, at *4 (E.D. Mich. 2008) (concluding that "nothing in [*Heller*] . . . casts doubt on the constitutionality of" the NFA's regulation of silencers); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1489 & n.187 (2009) ("Bans on silencers . . . would . . . likely be constitutional because they don't materially burden self-defense." (citing *People v. Brown*, 235 N.W. 245, 246–47 (Mich. 1933) (upholding a ban on silencers, among other weapons, because the ban focused on "a partial inventory of the arsenal of the 'public enemy,' the 'gangster'"; it didn't include "weapons usually relied upon by good citizens for defense or pleasure")).

More importantly, though, the indictment charged Cox with, and the jury found him guilty of, engaging in business as a dealer or manufacturer of *silencers* in violation of the NFA. And as we've already concluded, the right to bear arms doesn't extend to silencers. Even if the Second Amendment covers the right to buy and sell arms in the abstract, it can't in practice protect the right to buy and sell instruments, such as silencers, that fall outside its ambit. Thus, as they apply to Cox in particular, the NFA's taxation and registration requirements for firearms manufacturers and dealers don't burden protected conduct.

\* \* \*

In sum, the Second Amendment protects neither (1) short-barreled rifles, nor (2) silencers, nor (3) the business of manufacturing and dealing in silencers, so the NFA's regulation of these activities doesn't burden protected conduct. Our analysis thus ends at its first step, and we needn't test the challenged regulations under any form of means–end scrutiny. *See Reese*, 627 F.3d at 800–01.

### b. Applying the Rule of *Cox v. New Hampshire* and *Murdock v. Pennsylvania* to Second Amendment Rights

For the first time on appeal, Cox and Kettler urge us to find that NFA taxes violate the Second Amendment by "impos[ing] a charge for the enjoyment of a right granted by the federal constitution." *Murdock*, 319 U.S. at 113. Under *Murdock* and *Cox*, seminal cases in the Court's "fee jurisprudence," the government may collect a fee to defray administrative and maintenance costs associated with the exercise of a constitutional (usually First Amendment) right, but it can't impose a general revenue

tax on the exercise of such a right. *Compare Murdock*, 319 U.S. at 113 (striking down a license tax on the exercise of the First Amendment right to free speech), *with Cox*, 312 U.S. at 576–77 (upholding a parade-licensing fee that the state charged "to meet the expense incident to the administration of [the parade] and to the maintenance of the public order").

When they raised the Second Amendment in the district-court proceedings, neither Cox nor Kettler cited the Court's fee jurisprudence, so the government urges us to review this argument for plain error. But it doesn't matter whether we review for plain error or not, because the district court didn't err (plainly or otherwise) in not applying the framework of *Murdock* and *Cox*.

As the government notes, neither this court nor the Supreme Court has applied *Murdock* or *Cox* in the Second Amendment context. To analyze Second Amendment challenges to federal statutes, we have used *Reese*'s two-step test, borrowed from the Third Circuit, which does not incorporate the Court's fee jurisprudence. *See Reese*, 627 F.3d at 800–01 (concluding that *Heller* "suggests a two-pronged approach to Second Amendment challenges," which asks whether the challenged law burdens protected conduct and, if so, whether it passes muster "under some form of means-end scrutiny" (quoting *Marzzarella*, 614 F.3d at 89)).

We recognize that other circuits have imported fee-jurisprudence principles to their Second Amendment analyses. *See, e.g., Bauer v. Becerra*, 858 F.3d 1216, 1225 (9th Cir. 2017) (applying the fee-jurisprudence framework and concluding that fees supporting an extended background-check program "can fairly be considered an

'expense[] of policing the activities in question,' or an 'expense incident to . . . the maintenance of public order in the matter licensed'" (alterations in original) (quoting *Murdock*, 319 U.S. at 113–14, and *Cox*, 312 U.S. at 577)); *Kwong v. Bloomberg*, 723 F.3d 160, 165 (2d Cir. 2013) (deciding that "the Supreme Court's First Amendment fee jurisprudence provides the appropriate foundation for addressing" the plaintiffs' challenge to a handgun-licensing fee). But this appeal isn't the right vehicle to test that approach in our circuit, given our conclusion that the Second Amendment covers neither silencers nor short-barreled rifles. NFA taxes on the possession, transfer, and manufacture of these items do not constitute "charge[s] for the enjoyment of a right granted by the federal constitution," so they need not be measured against administrative costs or the expense of maintaining public order. *Murdock*, 319 U.S. at 113.

* * *

For these reasons, we conclude that the NFA comports with Cox's and Kettler's Second Amendment right to bear arms.

## B. Kansas's Second Amendment Protection Act

The validity of the Second Amendment Protection Act has never been at issue in this case, yet the statute has played an outsized role since the case began. Now on appeal, Cox and Kettler both contend—albeit through differing theories—that the district court reversibly erred in ruling that they couldn't use their reliance on the SAPA as a defense to breaking federal firearms laws. Separately and additionally,

Kettler claims that the SAPA caused a clash between the Governor of Kansas and the U.S. Attorney General, which led, unjustly, to his prosecution.

The availability and scope of any defense based on the SAPA present legal questions that we review de novo. *Cf. United States v. Hernandez-Urista*, 9 F.3d 82, 83, 84 (10th Cir. 1993) (reviewing de novo whether a good-faith defense required that the defendant's good-faith belief be reasonable). We start our analysis with an overview of the SAPA, and then turn to Cox's and Kettler's arguments.

The SAPA spans about three pages of the *Kansas Register*, but its most oft-quoted section in this appeal is § 4(a), which states,

> A personal firearm, a firearm accessory or ammunition that is manufactured commercially or privately and owned in Kansas and that remains within the borders of Kansas is not subject to any federal law, treaty, federal regulation, or federal executive action, including any federal firearm or ammunition registration program, under the authority of congress to regulate interstate commerce. It is declared by the legislature that those items have not traveled in interstate commerce. This section applies to a firearm, a firearm accessory or ammunition that is manufactured commercially or privately and owned in the state of Kansas.

Second Amendment Protection Act § 4(a) (codified at Kan. Stat. Ann. § 50-1204(a)).

The SAPA also:

- declares "[a]ny act, law, treaty, order, rule or regulation of the government of the United States" that violates the Second Amendment "null, void and unenforceable in the state of Kansas," Kan. Stat. Ann. § 50-1206(a);

- prohibits Kansas officials from enforcing, or attempting to enforce, "any act, law, treaty, order, rule or regulation of the government of the United States regarding any personal firearm, firearm accessory or ammunition that is manufactured commercially or privately and

32

owned in the state of Kansas and that remains within the borders of Kansas," Kan. Stat. Ann. § 50-1206(b); and,

- subjects any federal official who enforces, or tries to enforce, "any act, law, treaty, order, rule or regulation of the government of the United States regarding a firearm, a firearm accessory, or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains within the borders of Kansas" to prosecution for "a severity level 10 nonperson felony," Kan. Stat. Ann. § 50-1207.

## 1. Is Reliance on the Second Amendment Protection Act a Defense?

Cox and Kettler both claim (and the government doesn't dispute) that they understood the SAPA to insulate from federal regulation the making, possession, and transfer of firearms within Kansas's borders. That was a mistake—the NFA's taxes and registration requirements apply to all statutorily defined firearms—yet Cox and Kettler argue that their reliance on the SAPA still provided a defense to the charges that they violated the NFA.

The district court permitted mention of the SAPA during trial "as part of the *res gestae* of the offenses," but it didn't let Cox and Kettler claim reliance on the SAPA as a defense. Cox R. vol. 1 at 194–95.[14] In doing so, it relied on settled law.

---

[14] Cox specifically notes that the court: (1) denied his request to introduce a copy of the SAPA displayed in his store; (2) refused to instruct the jury that he was raising, "as a complete defense[,] . . . that he acted in 'good faith' in his belief he was following State law [the SAPA] that superseded application of the federal law" charged in the indictment, Cox R. vol. 1 at 207; (3) instructed the jury, over his and Kettler's objections, that to establish the offenses of possession (26 U.S.C. § 5861(d)) or transfer (§ 5861(e)) of an unregistered firearm, "[t]he government [wa]s not required to prove that the defendant knew that the firearm was not registered or had to be registered," Cox R. vol. 1 at 287, 290; and (4) instructed the jury, over Cox's and Kettler's objections, that because the government needn't prove

33

The NFA's list of "[p]rohibited acts" in 26 U.S.C. § 5861 is silent regarding violators' mental state; the statute just makes it "unlawful for any person" to be a firearms dealer; or to make, receive, possess, or transfer a firearm in violation of the NFA's registration or other provisions. Silence, though, doesn't necessarily mean "that Congress intended to dispense with a conventional *mens rea* element, which would require that the defendant know the facts that make his conduct illegal." *Staples v. United States*, 511 U.S. 600, 605 (1994) (citing *United States v. Balint*, 258 U.S. 250, 251 (1922)). In the context of § 5861(d) in particular, which makes it unlawful "to receive or possess" an unregistered firearm, the government must prove that a defendant knew the features of the firearm that made it a "firearm" under the NFA. *Id.* at 619. A defendant need not, however, know that the firearm was unregistered. *Id.* at 609 (citing *United States v. Freed*, 401 U.S. 601, 607–09 (1971)). "Knowledge of whether the gun was registered is so closely related to knowledge of the registration requirement that requiring the Government to prove the former would in effect require it to prove knowledge of the law." *Id.* at 622 n.3 (Ginsburg, J., concurring). And as a general rule, ignorance of the law or a mistake of law is no defense to criminal prosecution. *Cheek v. United States*, 498 U.S. 192, 199 (1991);

---

a defendant's knowledge of the NFA's registration requirements, "it [wa]s not a defense to a charge under [26 U.S.C.] § 5861 that a defendant may have believed, based on Kansas law, that the National Firearms Act did not require registration of a firearm," Cox R. vol. 1 at 295.

*accord Staples*, 511 U.S. at 622 n.3 (Ginsburg, J., concurring) (citing *Freed*, 401 U.S. at 612–14 (Brennan, J., concurring)).

That general mistake-of-law rule forecloses Cox and Kettler's proposed defense—that they wrongly believed, in reliance on the SAPA, that federal firearms regulations didn't reach their Kansas-centric activities. To be criminally liable, Cox and Kettler didn't need to know that their acts were "illegal, wrong, or blameworthy." *Freed*, 401 U.S. at 612 (Brennan, J., concurring). But Cox and Kettler urge us not to apply the general rule here. Something about the SAPA, they claim, changes things. Their arguments differ enough that we address them separately.

### a. Cox's Argument: A Due Process Problem

Cox grounds his argument in the due-process principle that a defendant deserves "a meaningful opportunity to present a complete defense." Cox's Opening Br. at 23–24 (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). He argues for a limited exception, in cases like his, to the rule that ignorance of the law isn't a defense. If (1) "the accused's conduct is subject to facially conflicting state and federal laws," and if (2) "the state law has not (yet) been held inapplicable, inferior, or illegitimate by any court," then, he claims, "the accused's good-faith reliance on the state law is a complete defense to criminal charges brought under the federal law." *Id.* at 24.

Cox asserts that in prior cases, the Supreme Court has endorsed similar defenses based on notions of due process, notice, and fairness. In an appeal brought by a different Mr. Cox, for example, the Court concluded that the Due Process Clause

35

prevented the government from "convicting a citizen for exercising a privilege which the [government] had clearly told him was available to him." *Cox v. Louisiana*, 379 U.S. 559, 571 (1965) (quoting *Raley v. Ohio*, 360 U.S. 423, 426 (1959)). In *Cox*, "the highest police officials of the city, in the presence of the Sheriff and Mayor," had told demonstrators, including Mr. Cox, that they could meet at a spot about 101 feet from the courthouse steps, but after the demonstration (at that spot), the state prosecuted Cox for violating a statute banning picketing "in or near" a courthouse. *Id.* at 560, 571. Based on the public officials' actions, the Court struck Cox's conviction, reasoning that to sustain it "would be to sanction an indefensible sort of entrapment by the State." *Id.* at 571 (quoting *Raley*, 360 U.S. at 426); *see also United States v. Pa. Indus. Chem. Corp.*, 411 U.S. 655, 657, 673–74 (1973) (allowing a corporation to assert, as a defense to a charge of polluting a river in violation of the Rivers and Harbors Act, that it had relied on the Army Corps of Engineers'—the administrative agency responsible for interpreting the Act—"longstanding administrative construction of [the Act] as limited to water deposits that impede or obstruct navigation").

In this circuit, courts treat such due-process challenges as claims of entrapment by estoppel. *See United States v. Hardridge*, 379 F.3d 1188, 1192 (10th Cir. 2004) (citing *Raley*, 360 U.S. at 426, and *Cox*, 379 U.S. at 571). To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was "responsible for interpreting, administering, or

36

enforcing the law defining the offense"; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was "reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Id.* (quoting *United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1167 (10th Cir. 1999), and *United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994)).

Here, Cox wouldn't be able to prove either (1) that the misleading government agent (the Kansas legislature) was responsible for interpreting, administering, or enforcing the law defining the offense (the NFA) or (2) that his reliance on the misleading pronouncement (the SAPA) was reasonable in light of the circumstances. First, unlike the police in *Cox*, who enforced the anti-picketing law, or the Army Corps of Engineers in *Pennsylvania Industrial Chemical*, which administered the Rivers and Harbors Act, the Kansas legislature (which wrote the SAPA) isn't responsible for administering or enforcing the NFA (or any other federal law). Second, irrespective of the government agent's identity, the substance of the SAPA's misrepresentation made Cox's reliance on it unreasonable. Section 4(a) of the SAPA expressly states that certain firearms and accessories, if kept in Kansas, aren't "subject to any federal law, treaty, federal regulation, or federal executive action, including any federal firearm or ammunition registration program, under the authority of congress *to regulate interstate commerce*. It is declared by the legislature that those items have *not traveled in interstate commerce*." Kan. Stat. Ann.

§ 50-1204(a) (emphases added). But the SAPA says nothing about laws, such as the NFA, passed under Congress's authority *to tax*.

Cox counters that this reading of the SAPA "ignores provisions in the Act that prohibit both state and federal actors from enforcing 'any' federal firearms laws or regulations with respect to local firearms." Cox's Reply Br. at 2–3 (citing Kan. Stat. Ann. §§ 50-1206(b), 1207). But Cox is wrong that "[n]o Commerce Clause limit appears" in these provisions, which prohibit state officials from, and subject federal officials to prosecution for, enforcing or attempting to enforce federal laws against any firearm, accessory, or ammunition "that is manufactured commercially or privately and owned *in the state of Kansas* and that remains *within the borders of Kansas*." Cox's Reply Br. at 3; Kan. Stat. Ann. §§ 50-1206(b), 1207 (emphases added). These provisions protect only homegrown, local firearms, so the Kansas legislature didn't need to utter the magic words, "Commerce Clause," to make clear its intent to preserve constitutional limits on the federal government's power over intrastate activity. Kansas wasn't considering, and didn't purport to limit, Congress's taxing-clause authority. Any other interpretation ignores the SAPA's emphasis on the local nature of the firearms' (and accessories') manufacture and ownership.

Cox, therefore, can't use the SAPA to establish an entrapment-by-estoppel defense in this case. *Cf. Hardridge*, 379 F.3d at 1192–96 (rejecting representations about the application of federal firearms laws made (1) by the Kansas City Police Department, (2) by the defendant's state-court sentencing judge, and (3) by a licensed federal firearms dealer as bases for an entrapment-by-estoppel defense); *Gutierrez-*

38

*Gonzalez,* 184 F.3d at 1168–69 (denying an entrapment-by-estoppel defense based on alleged misrepresentations made (1) by a private entity that assisted deported, indigent aliens, because the entity wasn't a government agency and because the defendant's reliance on its misrepresentations wasn't reasonable given the defendant's admission that he was in the country illegally, and (2) by an immigration official, because the defendant couldn't reasonably form the belief that he was in the U.S. legally merely from the official's failure to arrest him "on the spot").

Nor do notions of due process warrant expanding entrapment by estoppel and creating a new, estoppel-like defense to fit situations in which "the accused's conduct is subject to facially conflicting state and federal laws" and the accused acts in good-faith reliance on the state law. Cox's Opening Br. at 24. Nothing about a statute makes reliance on its pronouncements more consequential than reliance on a government agent's non-statutory statements.[15] And before we apply the doctrine of

---

[15] According to Cox, "[t]he collective judgment of an entire state legislature, regardless of jurisdiction, is surely more trustworthy than the advice of an extra-jurisdictional individual official." Cox's Opening Br. at 30. But the superiority of collective judgments is beside the point. State legislatures have no special expertise in, and aren't charged with enforcing, federal law. State legislators are more likely to consider their duty to promote their constituents' policy preferences than to expound on the reach of federal law.

Nor is Cox's analogy to the Fourth Amendment context persuasive. There, the Court has often deemed it reasonable for law-enforcement officers to rely on legislative pronouncements in forming probable cause. *See, e.g.*, *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979) ("The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws."). But whether an officer's belief was reasonable for probable-cause purposes is a very different question, with very

39

estoppel against the government, due process requires us to weigh the needs of society against the "natural sympathy" that we may feel toward defendants like Cox and Kettler, who have been prosecuted for conduct that, based on a state statute's assurances, they believed was lawful. *Hardridge*, 379 F.3d at 1194. Application of the estoppel doctrine is justified only if it doesn't "interfere with underlying government policies or unduly undermine the correct enforcement of a particular law or regulation." *United States v. Browning*, 630 F.2d 694, 702 (10th Cir. 1980) (citing 27 A.L.R. Fed. 702 (1976)). Here, though, allowing state legislatures to estop the federal government from prosecuting its laws would upset the balance of powers between states and the federal government and contravene the Supremacy Clause. *See* U.S. Const. art. VI. We can't countenance that result, so we decline to adopt Cox's proposed defense.

Accordingly, we reject Cox's argument that due process required that he be able to present his reliance on the SAPA as a defense.

### b. Kettler's Argument: Mens Rea and the Model Penal Code's Approach

Kettler, in turn, focuses on the mens rea element of possessing an unregistered firearm (in his case, a silencer) in violation of 26 U.S.C. § 5861(d). He claims that the "jurisdictional dispute between sovereigns" over the SAPA "demands a more

---

different consequences, than whether a defendant's reliance was reasonable for estoppel purposes. So different, in fact, that answering the former doesn't help answer the latter.

40

thoughtful analysis of the *mens rea* element of 26 U.S.C. § 5861 than given by the court below." Kettler's Opening Br. at 50. Because possession of an unregistered silencer is a "morally indifferent" act ("*malum prohibitum*, not *malum in se*"), he contends, the mens rea element should yield to a mistake-of-law defense premised on the Model Penal Code's approach. *Id.* at 53.[16]

Section 2.04(3) of the Model Penal Code, titled "Ignorance or Mistake," provides,

> A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when:
>
> . . .
>
> (b) [the actor] acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in (i) *a statute or other enactment*; (ii) a judicial decision, opinion or judgment; (iii) an administrative order or grant of permission; or (iv) an official interpretation of the public officer or body charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense.

Model Penal Code § 2.04(3) (Am. Law Inst. 2017) (emphasis added).

According to the explanatory note, this subsection "establishes a limited exception to the principle . . . that culpability is not generally required as to the illegality of the actor's conduct." *Id.* § 2.04 Explanatory Note. But the drafters delineated this exception "narrowly . . . so as to induce fair results without undue risk

---

[16] Cox also mentions the Model Penal Code, claiming that it's consistent with his proposed good-faith defense. And Cox, too, argues that NFA offenses aren't inherently immoral, a trait that, he claims, "weighs in favor of recognizing his [good-faith] defense." Cox's Opening Br. at 34. To avoid duplicating any analysis, we address both points only once, here.

of spurious litigation." *Id.* Thus, for instance, § 2.04(3)(b)(iv) permits reliance on an "official statement of the law" contained in an "official interpretation of the public officer or body" only if the interpreting officer or body is "charged by law with responsibility for the interpretation, administration or enforcement of the law defining the offense."

Yet unlike paragraph (b)(iv) of § 2.04(3), paragraph (b)(i) does not expressly limit the "statute[s] or other enactment[s]" on whose pronouncements a defendant may "act in reasonable reliance." Model Penal Code § 2.04(3)(b)(i). So, Kettler contends, paragraph (b)(i) permits reliance on a statute (like the SAPA) regardless of the enacting legislature's jurisdiction, "suppl[ying] a defense directly supporting [his] case." Kettler's Opening Br. at 54.

We disagree. The drafters of the Model Penal Code's ignorance-or-mistake-of-law defense intended only a narrow exception in the interest of fair results. *See* Model Penal Code § 2.04(3) Introductory Note. Thus, the code's failure to restrict reliance on statutes to those passed under the same authority as the law defining the offense probably reflects that the drafters weren't considering our circumstance, not that they intended to allow state governments to estop the federal government from enforcing its laws. After all, the plain language of the code requires "*reasonable* reliance upon an *official* statement of the law." *Id.* § 2.04(3)(b) (emphases added). A state legislature's statement about the reach of federal law is hardly an "official" statement of federal law, and to rely on such a statement is not reasonable.

Ultimately, however, the Model Penal Code isn't the law in this circuit. Like Cox's, Kettler's claim sounds in this circuit's doctrine of entrapment by estoppel. *See Gutierrez-Gonzalez*, 184 F.3d at 1166–68. And we've already concluded, in resolving Cox's claim, that reliance on the SAPA can't sustain an entrapment-by-estoppel defense in these cases. *See supra* Section B.1.a. It's fatal to their proposed defense that "in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation," Cox's and Kettler's reliance on the SAPA was not reasonable. *Nichols*, 21 F.3d at 1018.

Nor does Kettler's characterization of an NFA offense as "*malum prohibitum*," or wrong only because of a statutory proscription, justify broadening the entrapment-by-estoppel doctrine's (or the Model Penal Code's) exception to the rule that a mistake of law generally provides no defense to a criminal prosecution. Kettler's Opening Br. at 52. Kettler claims that "everyone knows the laws of the Creator, as they are written in the created order and imprinted by the Creator on every man" and that, as a result, the general mistake-of-law rule applies only to offenses that are mala in se (inherently wrong), not mala prohibita. *Id.* (citing *Romans* 1:18–20). But he cites no legal precedent carving out such an exception.

In *Cheek*, the Court explained the general mistake-of-law rule's provenance: "[b]ased on the notion that the law is definite and knowable, the common law presumed that every person knew the law." 498 U.S. at 199. That presumption might not always hold true anymore given the "proliferation of statutes and regulations," especially in the tax context, so Congress has "softened" its impact "by making

43

specific intent to violate the law an element of certain federal criminal tax offenses."
*Id.* at 199–200 (citing *United States v. Murdock*, 290 U.S. 389 (1933)). Accordingly, *Cheek* recognized that since the 1930's, the Court has interpreted the term "willfully" in federal criminal tax statutes "as carving out an exception to the traditional rule." *Id.* at 200. "Willfulness," *Cheek* explained, means "the 'voluntary, intentional violation of a known legal duty.'" *Id.* at 201 (quoting *United States v. Pomponio*, 429 U.S. 10, 12 (1976)). *Cheek*, however, didn't suggest that the general mistake-of-law rule disappears whenever an offense may be categorized as malum prohibitum.

Moreover, Congress didn't put a "willfulness" requirement in the NFA. *See* 26 U.S.C. § 5861. As explained above, the NFA is silent about mens rea. The Court filled the gap, based on the presumption that criminal liability should attach only when a defendant knows the facts that make his conduct illegal, by requiring that the defendant know the characteristics of a firearm that bring it within the NFA's ambit. *Staples*, 511 U.S. at 619. The Court took the mens-rea presumption no further, however, "lest it conflict with the related presumption, 'deeply rooted in the American legal system,' that, ordinarily, 'ignorance of the law or a mistake of law is no defense to criminal prosecution.'" *Id.* at 622 n.3 (Ginsburg, J., concurring) (quoting *Cheek*, 498 U.S. at 199). Under *Staples*, then, certain factual mistakes (e.g., that a firearm isn't a "firearm" for NFA purposes) may provide a defense to a charge of violating the NFA, but legal mistakes (e.g., that the NFA doesn't apply to locally made firearms) do not.

44

Accordingly, we reject Kettler's argument that the mens rea element of 26 U.S.C. § 5861 should be subject to a mistake-of-law defense like the Model Penal Code's.

* * *

Finally, we note that Cox's and Kettler's reliance on the SAPA did, in the end, mitigate their sentences, if not their guilt. At the sentencing hearing, the court reasoned that even though the SAPA wasn't available as a defense at trial, the court could "take [it] into account" in deciding to impose probationary, instead of prison, sentences. Cox R. vol. 3 at 716:14–15. Speaking to Cox and Kettler, the court said, "I believe that you both honestly felt that you were protected by [the SAPA] and I believe that to be so[.]" *Id.* at 716:15–17. Thus, the court continued, "I am giving you what benefit I can of that statute here at sentencing." *Id.* at 717:12–13. That benefit turned out to be two years' probation for Kettler and one year's for Cox. (The NFA allows for a penalty of up to ten years in prison, a fine of up to $10,000, or both for violating any of its provisions. 26 U.S.C. § 5871.)

For all these reasons, we conclude that the district court was correct to prohibit Cox and Kettler from introducing their reliance on the SAPA as a defense to their NFA charges. Cox and Kettler received a fair trial and, at sentencing, the benefit of their good-faith reliance on the SAPA, so we see no reason—be it grounded in notions of due process or premised on presumptions about mens rea—either to create a new defense out of whole cloth (as Cox suggests) or to borrow one from the Model Penal Code (as Kettler suggests).

45

## 2. Was Kettler "Snared in a Constitutional Dispute Between Two Independent but Interrelated Civil Sovereigns"?

In a related argument, Kettler contends that the political rumpus following the SAPA's enactment "snared [him] in a constitutional dispute between two independent but interrelated civil sovereigns." Kettler's Opening Br. at 36. Citing the Declaration of Independence and its protection of unalienable rights, he argues that "[w]henever any government becomes destructive of those rights, it is the duty of the people—through their lower civil magistrates—to resist the misuse of power even to the point of taking up arms against tyranny as America's founders did in 1776." *Id.* at 44–45 (footnote omitted). Contrary to the founders' federalist ideals, Kettler claims that after passing the SAPA, Kansas's resolve weakened. "In a deferential, not confrontational, letter," he notes, the Kansas Attorney General asked the U.S. Attorney General either to order the dismissal of the indictment or to support a presidential pardon. *Id.* at 46. But Kettler claims that he deserves more than clemency or a pardon—"[h]e deserves the protection of the republican form of government established in Kansas at the time of its admission to the union so that he is not punished for being caught between the two sovereigns to which he oversees allegiance." *Id.* at 47.

We're unable to give Kettler either as an appellate remedy. The Constitution created the "judicial Power" to resolve cases and controversies, U.S. Const. art. III, § 2, cl. 1, and to do so, we have jurisdiction "of appeals from all final decisions of the district courts," 28 U.S.C. § 1291. As Chief Justice Marshall wrote, "the essential

46

criterion of appellate jurisdiction" is "that it revises and corrects the proceedings in a cause already instituted, and does not create that cause." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 175 (1803). Yet in making his argument, Kettler points to no error in the district-court proceedings. Without such a claim, we can't simply order the executive branch to grant Kettler clemency or demand that Kansas grant him the protection of a republican form of government. Stated otherwise, to fulfill the judiciary's duty "to say what the law is," we need a legal question. *Id.* at 177.

Accordingly, we decline to grant Kettler relief for being "snared in a constitutional dispute" between Kansas and the federal government. Kettler's Opening Br. at 36.

## CONCLUSION

For these reasons, we affirm the judgments of the district court.

17-3034, *United States v. Cox*
17-3035, *United States v. Kettler*

**HARTZ**, Circuit Judge, concurrence

I join Judge Phillips's opinion in full. I add this comment solely to caution against overreading our holding regarding silencers. In determining that silencers are not protected by the Second Amendment, we explain that they are not "bearable arms." We had no occasion to consider whether items that are not themselves bearable arms but are necessary to the operation of a firearm (think ammunition) are also protected.