**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 23-4308**

───────────

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

HATCHET M. SPEED,

Defendant - Appellant.

───────────

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Michael Stefan Nachmanoff, District Judge. (1:22-cr-00165-MSN-1)

───────────

Argued: December 12, 2025                    Decided: May 5, 2026

───────────

Before WILKINSON, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

───────────

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Wilkinson and Judge Richardson joined. Judge Wilkinson wrote a concurring opinion. Judge Richardson wrote a concurring opinion.

───────────

**ARGUED:** Roger Isaac Roots, JOHN PIERCE LAW P.C., Woodland Hills, California, for Appellant. Brian James Samuels, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee. **ON BRIEF:** Edward Andrew Paltzik, BOCHNER PLLC, New York, New York, for Appellant. Jessica D. Aber, United States Attorney, Amanda St. Cyr, Assistant United States Attorney, Danya E. Atiyeh, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

───────────

QUATTLEBAUM, Circuit Judge:

The National Firearms Act, ch. 757, 48 Stat. 1236 (1934) (codified as amended in scattered sections of 26 U.S.C.), criminalizes the possession of unregistered firearms. And the NFA defines firearms to include silencers.[1] 26 U.S.C. § 5845(a)(7). The government prosecuted Hatchet M. Speed for possessing three unregistered devices that it felt met the NFA's definition of a silencer. Speed, however, insisted that the devices were not silencers and, as a result, did not have to be registered. He argued that they were "solvent traps," which are typically used to clean firearms, and that they didn't function as silencers without modifications.

Following a two-day trial, a federal jury found Speed guilty of three counts of unlawful possession of an unregistered silencer. He appeals his conviction, primarily arguing that the district court inaccurately instructed the jury on the definition of a silencer, that there is insufficient evidence that the devices meet that definition and that the government's interpretation of that definition is unconstitutionally vague as applied to him. Alternatively, he argues possession of a silencer is protected by the Second Amendment.

We affirm his conviction. First, the district court's instructions on the statutory definition of a silencer were accurate. Second, the government introduced sufficient

---

[1] "Silencer" and "suppressor" are two terms that are both used to refer to the same device. *See* Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second Amendment*, 46 CUMB. L. REV. 33, 34 (2015). In truth, suppressor is likely the better term because these devices only actually "silence" firearms in the movies. *Id.* at 36. "Noise may be muffled or diminished, and maybe by only a few decibels at that, but it can still be heard." *Id.* That said, we use the term "silencer" throughout this opinion because that is the term used in the relevant statute. *See* 26 U.S.C. § 5845(a)(7); *see also* 18 U.S.C. § 921(a)(25).

2

evidence for the jury to conclude that, despite being labeled as "solvent traps," Speed's devices were silencers under the NFA. Third, the NFA is not unconstitutionally vague as applied to Speed. Regardless of what other objects might qualify under that definition, Speed's devices plainly do. And finally, Speed has failed to carry his burden on his Second Amendment challenge.

## I.

Before delving into the facts leading to Speed's conviction, we start by outlining what a silencer is and how it is regulated under the NFA.

## A.

Guns are loud. While that is not news to anyone, why guns are loud may not be as widely known. The noise that a gun makes when fired—called its report—is the product of four processes: (1) the firearm's mechanical action, (2) propellant gases rapidly expanding into the atmosphere, (3) a sonic crack and (4) the bullet in flight.[2] Silencers influence the second of these processes by allowing the rapidly expanding propellant gases to expand into a hollow chamber, called an expansion chamber, before cooling and diffusing into the atmosphere.

To explain how this happens and how it affects the sound a gun makes, we will give a little more detail about the mechanics of silencers. A silencer is typically a metal cylinder

---

[2] We take the background information on how silencers work from the testimony of Eve Eisenbise of the Bureau of Alcohol, Tobacco, Firearms and Explosives, who qualified at trial, without objection, as an expert in the identification of firearms, including silencers. *See also* Matthew Every, *How Does a Silencer Work?*, FIELD & STREAM (Jan. 23, 2026), https://fieldandstream.com/outdoor-gear/guns-gear/rifles-gear/how-does-a-silencer-work [https://perma.cc/NZB3-YGJW].

that is attached to the end of the barrel of a gun. The ends of the cylinder, called the end caps, have holes. The hole in the rear-end cap is often threaded and attaches to the barrel of the firearm. The opposite hole in the front-end cap allows a bullet to pass through. As the bullet passes through the silencer's chamber, gases expand before they reach the atmosphere. Since the expansion of gases in the atmosphere is one of the reasons firing a gun makes a loud noise, there is less noise if some of the expansion takes place inside the silencer's hollow chamber.

Also, while an expansion chamber is all that is needed for a silencer to accomplish its basic function, silencers often have internal components that improve their effectiveness. A common internal component is a baffle. In essence, a baffle is a wall within the silencer, often shaped like a cup or cone, that divides the hollow chamber to make smaller, individual expansion chambers. The more chambers within the hollow part of the device, the more the gases expand within the chambers and, in turn, the more the sound from firing the gun is suppressed.

**B.**

The NFA defines "firearm" to include "any silencer."[3] 26 U.S.C. § 5845(a)(7). And the statute incorporates the following definition of silencers:

---

[3] In full, the NFA defines "firearm" to mean:

(1) a shotgun having a barrel or barrels of less than 18 inches in length; (2) a weapon made from a shotgun if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length; (3) a rifle having a barrel or barrels of less than 16 inches in length; (4) a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in

4

> The terms "firearm silencer" and "firearm muffler" mean any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

18 U.S.C. § 921(a)(25), *incorporated by reference in* 26 U.S.C. § 5845(a).

All NFA-regulated firearms must be registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives. 26 U.S.C. §§ 5841(a), 7801(a)(2)(A); 28 C.F.R. § 0.131(d). Section 5861(d) of Title 26 of the United States Code makes it unlawful for any individual "to receive or possess a firearm which is not registered to him." And 26 U.S.C. § 5871 sets the maximum penalties for violating this provision—a $10,000 fine, 10 years' imprisonment or both.

Before anyone can transfer an NFA-regulated firearm, the transferor must apply to the ATF using ATF Form 4. 26 U.S.C. § 5812(a); 27 C.F.R. § 479.84(a)–(b). Form 4 requires a transferor to, among other things, identify both the transferor and the transferee, describe the firearm and affirm that any applicable tax has been paid. § 479.84(a)–(b). Similarly, an individual wishing to manufacture an NFA-regulated firearm must apply to the ATF using ATF Form 1. 26 U.S.C. § 5822; 27 C.F.R. § 479.62(a)–(b). Form 1 requires

---

length; (5) any other weapon, as defined in subsection (e); (6) a machinegun; (7) any silencer (as defined in section 921 of title 18, United States Code); and (8) a destructive device. The term "firearm" shall not include an antique firearm or any device (other than a machinegun or destructive device) which, although designed as a weapon, the Secretary finds by reason of the date of its manufacture, value, design, and other characteristics is primarily a collector's item and is not likely to be used as a weapon.

26 U.S.C. § 5845(a).

5

a manufacturer to, among other things, identify the applicant, describe the firearm and indicate that any applicable tax has been paid. § 479.62(a)–(b).

## C.

Speed is a former software developer and naval reservist from northern Virginia. He was convicted for various charges related to the events at the United States Capitol Building on January 6, 2021.[4] In the months following that incident, he began "panic buying" over $40,000 in firearms and related products. J.A. 933, 1227.

As part of this shopping spree, Speed ordered four silencers from an online firearm retailer called Silencer Shop—two for a 9mm and two for a .45 caliber firearm.[5] About a month after Speed's purchase, Silencer Shop sent Speed an email stating that his Form 4 application for ATF approval had been submitted and that Silencer Shop was waiting for approval before sending Speed his order.

A few days after receiving that email, Speed ordered 9mm, .45 caliber and .223 caliber "solvent traps" from a company called Hawk Innovative Tech (HIT). J.A. 942–43, 1158. A solvent trap can be used when cleaning a firearm. Cleaning usually involves pouring solvent inside the barrel and then using a rod to push wire brushes or cloth patches

---

[4] Speed was sentenced to 48 months of imprisonment for those charges. Judgment at 3, *United States v. Speed*, No. 1:22-cr-00244-TNM-1 (D.D.C. May 15, 2023), ECF No. 69. But President Trump pardoned Speed, among several others, for that crime on January 20, 2025. *See Freedom of Information Act (FOIA) Release – Pardon Certificate Recipients*, U.S. Dep't of Just., Off. of the Pardon Att'y (Mar. 5, 2026), https://www.justice.gov/pardon/freedom-information-act-foia-release-pardon-certificate-recipients [https://perma.cc/567Z-JRRL].

[5] Speed had also previously purchased silencers from Silencer Shop on June 25, 2020, submitting the required ATF registration forms.

6

through. But when brushes or patches are pushed out the other side of the barrel, solvent and wet patches can spill out of the barrel, creating a mess. A solvent trap is designed to solve this problem. Usually, it consists of a clear piece of plastic that can be attached to the end of a barrel to catch the solvent and patches that are pushed through to the other side. Typically, a solvent trap costs between $10 and $20.

The HIT "solvent traps" that Speed purchased differed from typical solvent traps in both cost and design. In terms of cost, the HIT devices cost between $170 and $330—or roughly 10 to 20 times the average cost of a typical solvent trap. As for design, instead of clear plastic, the HIT devices were black titanium cylinders. One end of each device featured a threaded hole or could be attached to an adaptor to be threaded into a gun's barrel, much like a silencer. Inside each device there was a series of cone-shaped parts that looked like baffles. Each baffle had a center hole that was sized and aligned for a bullet corresponding with the device's caliber to pass through. And the other end of each device had another small hole. This hole, like the hole in each baffle, was aligned with the center of each device. But it was only partially drilled. The hole needed to be completely drilled for a bullet to pass through.

In total, Speed paid $887.49 for the HIT devices. Paperwork included with the products labeled the devices as solvent traps and said "[t]he HIT solvent filter/recycler is designed, manufactured, assembled, and sold for the intended purpose as a cleaning device or as a dry container storage." J.A. 1076–77. HIT also instructed customers to use the devices "only as intended." J.A. 1077.

7

**D.**

The Federal Bureau of Investigation took notice of Speed after the events on January 6. Beginning in February 2022, an undercover FBI employee, referred to as "Al," met with Speed on multiple occasions and posed as a friend with like-minded politics. J.A. 839–40. At trial, Al described Speed as having a "grim outlook at the government" and testified that Speed was "[p]repping" for possible civil unrest. J.A. 847. Several of their conversations focused on firearms and firearm accessories. During one meeting, Al asked Speed what he knew about solvent traps that could be converted into silencers. Speed explained to Al that he had purchased some but had not yet converted them. Speed added that, while he did not have the drill required to make the conversion, "the idea [was] to get everything except that, and then you as—you get a good drill press, and you know you're doing, just drill straight through." J.A. 1229.

In a subsequent conversation, Al asked Speed again about Speed's knowledge of how these solvent traps work. Speed replied that the HIT devices would "stay quiet" but reiterated that he had not tried to use his yet. J.A. 1238. Al then asked Speed where he could purchase one. Speed explained that they were available online but suggested a local retailer because the retailer "kn[ew] why people [we]re buying them" and could explain how to convert the devices into functioning silencers. J.A. 1238. He elaborated,

> [Y]ou can just point to them and just ask them to explain it to you, and they'll say, "Okay."
>
> . . . .

8

"If you do this and this" and then you have to have a form on there. Of course, they're—they're—they're giving you the—the legal version, which they have to do.

. . . .

And you don't have to—they know that you're—why you're doing it.

. . . .

Uh, you don't have to say, uh, what's it for.

J.A. 1238–39.

Speed told Al how to drill the hole into the HIT device to convert it into a silencer. While he reiterated that he did not have the tools, Speed explained again that it would be easy to figure out how to get them and complete the task when necessary.

Speed also hinted at his plans to use the HIT devices. Disturbingly, Speed discussed how he could "reach," or get close to, certain people in his neighborhood. J.A. 1231–32. And he contemplated how, when picking a person to "reach," he might conduct his own mock trial for that person by writing down arguments for and against that person and then coming to his own decision on whether to "put th[at] person on the list." J.A. 1232. He praised the *jihadists* who killed Christians because their methods were effective. Speed believed that if three percent of people "would take action"—by taking out one person and then getting killed or jailed—"we can literally win just on the numbers." J.A. 1234–35. He added that if that were done, "we would manage to leave one percent of true fighters. We'd

9

wipe out the opposition and leave the entire country free to finally live through that."[6] J.A. 1235.

Tying these comments to the HIT devices, Al asked, "You think at that point your . . . solvent traps would come in handy?" J.A. 1232. And Speed replied, "Yeah. Yeah, that's the idea." J.A. 1232.

Later, FBI agents executed a search warrant at a storage unit rented by Speed. During the search, the FBI seized the HIT devices Speed had purchased. However, the storage unit contained no tools—such as a drill, drill bit or vise—needed to drill the necessary holes.

**E.**

A federal grand jury in the Eastern District of Virgina indicted Speed for three counts of unlawful possession of an unregistered silencer in violation of 26 U.S.C. §§ 5841, 5861(d) and 5871. Speed moved to dismiss the indictment, arguing that § 5861(d) and related regulations were unconstitutionally vague as applied to him and that his conviction would violate the Second Amendment. The district court denied his motion. It reasoned that Speed's vagueness challenge was predicated on facts that would be established at trial, so it said Speed could raise that challenge later. And it determined silencers do not meet

---

[6] The government notes in its brief that Speed was making these comments in the context of his desire to "wipe out" Jewish people. Resp. Br. at 4–5; *see also* J.A. 134. However, the references to Jewish people were redacted from the version of the conversation presented to the jury at trial, so we omit them from our discussion of the facts leading to Speed's conviction.

the definition of "bearable arms" under the Second Amendment because they are not, by themselves, capable of harming or damaging others. J.A. 188.

As trial approached, Speed also objected to proposed jury instructions that stated a device need not be operable to be considered a silencer. The district court overruled that objection. It determined that its instructions were a correct statement of law—because the statutory definition focuses on whether a device was designed to be a silencer—and that they were not redundant—because the instructions helped clarify the statutory definition.

After that, Speed's first trial ended in a mistrial after the jury could not reach a verdict. Speed's second trial ended with the jury finding Speed guilty on all three counts. The district court then sentenced Speed to 36 months of imprisonment. This appeal followed.[7]

**II.**

Speed raises several issues on appeal. His challenges largely fall into two buckets. Speed's first bucket involves whether the HIT devices he possessed meet the NFA's definition of a silencer. He argues that they do not. According to Speed, his HIT devices functioned as solvent traps, not silencers. He also argues that the "devices could not be 'assembled' into a silencer without modification or fabrication." Op. Br. at 41. And he adds that he did not have the tools necessary to convert the HIT devices into silencers. Next, Speed argues that the NFA's definition should not be interpreted to include items that function primarily for purposes other than as silencers. Otherwise, he argues, many

---

[7] We have jurisdiction over Speed's timely appeal of the district court's final judgment under 28 U.S.C. § 1291.

innocent objects such as "plastic bottles, potatoes, pillows, books, banners, flags, clothing, tools, electronic equipment, etc." could be criminalized as silencers. Op. Br. at 46.

Because he believes the HIT devices do not meet the NFA's definition, Speed advances three separate, but related, arguments: (1) the district court's jury instructions that a device need not be operable to be considered a silencer were incorrect as a matter of law, (2) the evidence presented at trial was insufficient to support his conviction and (3) the statutory definition of a silencer is unconstitutionally vague as applied to him.

Speed's second bucket involves the Second Amendment. According to Speed, if the NFA's definition of a silencer includes the HIT devices he possessed, it violates his Second Amendment rights. So, he alternatively argues his conviction should be vacated on that basis. We address Speed's arguments in turn.

**A.**

Starting with the first bucket, we begin with Speed's challenge to the district court's jury instructions before turning to his sufficiency and vagueness arguments.

**1.**

Speed argues that the district court's jury instructions incorrectly charged that a silencer need not be operable to support a conviction.[8] And to be sure, the jury instructions said just that:

> Under [the statutory definition of a silencer], the device does not need to be operable to substitute a silencer as long as the purpose of the device [is] to silence, muffle, or diminish the report of a portable firearm. In determining

---

[8] While we generally review a district court's jury instructions for abuse of discretion, we review whether the instructions correctly stated the law de novo. *Gautier v. Tams Mgmt., Inc.*, 163 F.4th 786, 794 (4th Cir. 2026).

whether the purpose of a device is to silence, muffle, or diminish the report of a portable firearm, you should focus on the objective design features of the device.

J.A. 1126.

To determine whether the instructions correctly articulated the statutory definition of a silencer, we must examine the statutory language. *See Bufkin v. Collins*, 604 U.S. 369, 379 (2025) ("We start, as always, with the text."). Recall that the statute defines "firearm silencer" and "firearm muffler" as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication." 18 U.S.C. § 921(a)(25). This definition does not say that a device, or various parts, must be operable as a silencer. In fact, it suggests the opposite.

First, the definition includes "any device for silencing, muffling, or diminishing the report of a portable firearm." *Id.* The word "for" is an important clue. Dictionary definitions from around 1986 when Congress enacted this definition reveal that "for" is "a function word to indicate purpose," "an intended goal" or "suitability or fitness." *For*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1983). Purpose and intended goal suggest that our inquiry is guided by what the device is designed to do—not current functionality. True, suitability or fitness suggest a device's function is relevant. But those words do not suggest that only the device's current function matters. In other words, nothing in the definition suggests the fact that the possessor might have to take the additional step of drilling a hole takes a device or parts outside the NFA's definition.

13

Had Congress intended to cover only devices currently operating as silencers, it could easily have included such language. But it did not. And this conclusion accords with how our sister circuits have, so far as we are aware, universally approached the issue. *See United States v. Crooker*, 608 F.3d 94, 97 (1st Cir. 2010) ("The statute does not refer either to capability or adaptation; it speaks of a device 'for' silencing or muffling. The ordinary connotation of the word is one of purpose."); *United States v. Carter*, 465 F.3d 658, 667 (6th Cir. 2006) ("The language of the statute focuses on the intended application of a silencer, not its actual demonstrated operation."); *United States v. Syverson*, 90 F.3d 227, 232 (7th Cir. 1996) ("By the language of the definition, Congress has indicated that it intends to regulate all devices purporting to serve as silencers, not just those devices that actually work to silence firearms."); *see also United States v. Taylor*, 100 F. App'x 305, 308 (5th Cir. 2004) ("[C]ontrary to [the defendant's] assertion, the government did not have to prove that the silencers were in operating condition; it merely needed to prove that they could readily have been put into operating condition."), *cert. granted and judgment vacated on other grounds*, 543 U.S. 1108 (2005), *judgment reinstated*, 409 F.3d 675 (5th Cir. 2005).

Second, the statutory silencer definition specifically includes "any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler." § 921(a)(25). To the extent there is any question about whether the device or parts had to be currently operable as a silencer, this language clarifies that they don't. *See id.*; *Syverson*, 90 F.3d at 232; *see also Bondi v. VanDerStok*, 604 U.S. 458, 498 (2025) (Thomas, J., dissenting) (noting that § 921's definition of "silencer"

14

"cover[s] more than finished, operable products"). As written, the statute expressly contemplates parts intended for use in a silencer that must be assembled or fabricated to be used as a silencer. § 921(a)(25). Logically, parts that must be assembled or fabricated are not currently capable of being operated as a silencer.

In sum, the NFA's definition does not require a device to be currently operable as a silencer. In fact, it suggests the opposite. Accordingly, we see no error in the district court's challenged jury instructions.[9]

---

[9] Relatedly, Speed argues that the district court's jury instructions were in error because the instructions overemphasized the physical features of Speed's devices while deemphasizing Speed's intent. The district court gave the following instructions on motive and intent:

> Motive is not an element of the offense with which the defendant is charged. Proof of bad motive is not required to convict. Further, proof of bad motive alone does not establish that the defendant is guilty, and proof of good motive alone does not establish that the defendant is not guilty. Evidence of the defendant's motive may, however, help you find the defendant's intent. Intent and motive are different concepts. Motive is what prompts a person to act. Intent refers only to the state of mind with which the particular act is done. Personal advancement and financial gain, for example, are motives for much of human conduct; however, these motives may prompt one person to intentionally do something perfectly acceptable while prompting another person to intentionally do an act that is a crime.

J.A. 1127–28. When read in full, we do not read the district court's jury instructions as deemphasizing the requirement that the government prove criminal intent, and we find that the district court did not abuse its discretion in giving the instructions it did. *See Ward v. AutoZoners, LLC*, 958 F.3d 254, 272 (4th Cir. 2020) ("[W]e simply determine whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." (quoting *Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011))); *Westmoreland v. TWC Admin. LLC*, 924 F.3d 718, 731 (4th Cir. 2019) ("Absent legal error, we review a district court's jury charge under the highly deferential abuse of discretion standard.").

15

**2.**

Speed also argues that there was insufficient evidence to support his conviction. A defendant challenging the sufficiency of the evidence supporting his conviction "bears a heavy burden." *United States v. Freitekh*, 114 F.4th 292, 308 (4th Cir. 2024) (quoting *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997)). We review whether there was substantial evidence to support a conviction de novo but view the evidence in the light most favorable to the government and draw all reasonable inferences in the government's favor. *Id.* That means we do not ask if we agree with the jury's verdict. We only ask if there was evidence from which a reasonable jury could have reached a guilty verdict. *United States v. Smith*, 21 F.4th 122, 139–40 (4th Cir. 2021).

In attempting to meet this standard, Speed emphasizes that the HIT devices were labeled as solvent traps, could operate as solvent traps and could not be used as silencers without modification using tools he did not possess. If Speed were right about the definition of a silencer, he might have a point. But as we just explained, he is not—the NFA's definition of a silencer does not require the device to be currently operable in that capacity. *See* § 921(a)(25); *Crooker*, 608 F.3d at 97; *Carter*, 465 F.3d at 667; *Syverson*, 90 F.3d at 232. Nor is there anything in the definition suggesting that a device is not a silencer simply because it could also operate as another product. *See* § 921(a)(25); *see also Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 603 (1st Cir. 2016) (explaining the fact that a device could function as a muzzle brake was not dispositive of whether it was regulable as a silencer). Rather, the government presented sufficient evidence for a reasonable jury to conclude that the devices were in fact silencers.

16

To begin, consider the objective characteristics and design features of the devices. *See Sig Sauer*, 826 F.3d at 601–02; *cf. Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 25 (D.D.C. 2014) ("To be sure, physical characteristics may be one important factor."). The jury heard evidence about those characteristics and features. An ATF firearms expert testified at trial that the HIT devices would work well as silencers with only minor modification. She described how the devices were metal cylinders, that the devices could be threaded into a firearm barrel, that the devices contained cone-shaped parts resembling baffles and that there were holes aligned (even if not fully drilled through) with the center of the device that would allow a projectile to pass through. She also explained how she modified one of the devices to make it fully capable of functioning as a silencer. First, she removed the bolt that was covering the partially drilled out hole. Then, she finished drilling out the hole using a vise and a common hand drill that could be purchased at any hardware store—a process which took her five minutes. Following that, she tested the HIT device by attaching it to a pistol and test-firing. And she found that the HIT device reduced the pistol's report by 23.58 decibels, making it an "extremely effective" silencer. J.A. 1022.

In contrast, the expert also testified how these same design features made the devices ill-suited to function as solvent traps for several reasons. First, the devices were more expensive than most solvent traps. Second, because they were metal, a user could not see when a brush reached the end of the barrel when cleaning a firearm. Third, the "baffles" inside the HIT devices would not only serve no purpose in cleaning firearms but they would also interfere with cleaning by blocking brushes and making it difficult to retrieve patches or solvent once they came out the barrel. J.A. 1039.

17

Thus, the government produced evidence showing that, regardless of how they were labeled, the features of the HIT devices did not permit them to operate effectively as solvent traps but permitted the devices to operate very well as silencers. Paraphrasing the popular saying, if something walks like a silencer, swims like a silencer and quacks like a silencer, a reasonable jury could have found the device was a silencer.

The jury also heard evidence reflecting Speed's knowledge that the HIT devices were capable of being used as silencers. *See Staples v. United States*, 511 U.S. 600, 619 (1994) (holding that, to obtain a conviction for possession of an unregistered machinegun under a different section of the NFA, the government must prove that the defendant knew that his device possessed the characteristics making it subject to regulation under the NFA). Indeed, the jury heard evidence that Speed intended to use the devices for that purpose.

Speed stated to Al that he started "panic buying" firearms shortly after January 6, 2021. J.A. 1227. In February 2021, Speed first attempted to purchase silencers using the required ATF registration forms. Shortly after being told that it could take a while for his Form 4 application to work through ATF's approval process, Speed purchased the HIT devices. And Speed told Al he "bought a couple of those" in response to Al's question about people who were selling solvent traps as a "way to . . . circumvent suppressors." J.A. 1229. Speed also explained to Al how to drill the hole required to use his devices as silencers. On top of that, when Al asked about where to purchase one of these devices, Speed recommended a local retailer who could help because "they know why people are buying them." J.A. 1238.

18

In addition, Speed discussed how he intended to use his HIT devices. When Speed began discussing his desire to kill or kidnap certain individuals to bring about political change, Al asked, "your solvent traps would come in handy at that point?" J.A. 1232. Speed responded, "Yeah. Yeah, that's the idea." J.A. 1232. From this evidence, a reasonable jury could have concluded that Speed was aware that his devices were designed to function as silencers and purchased them for that purpose.[10]

In sum, the record contains sufficient evidence for the jury to have reasonably found each device met the statutory definition of a silencer.

---

[10] Speed sought to introduce the following statement at trial that he made to Al regarding the HIT "solvent traps": "[O]nce you drill a hole in the end without filling out the Form 1 [required to register silencers], you're a felon." Op. Br. at 27 n.8 (second alteration in original); J.A. 367. The district court excluded the statement, reasoning it showed only that Speed made a mistake of law, which was not relevant and which could have confused the jury under Federal Rule of Evidence 403. On appeal, Speed simultaneously argues that the statement was not a mistake of law and instead shows that Speed did not believe the device he possessed was a silencer—meaning he did not have the mens rea required to sustain his conviction—and that the statutory definition of a silencer makes his offense of conviction a specific-intent crime, for which a mistake of law can be a defense. Like the district court, we do not read this statement as showing Speed did not realize his devices were silencers. We read it as showing Speed was mistaken on what exactly is criminalized, meaning Speed made a mistake of law. Further, unlike in a case like *Rehaif v. United States*, 588 U.S. 225, 228–31, 235 (2019), in which some knowledge of the law is an element of the charged offense, this case is much more like *Staples*, 511 U.S. at 614–16, 619, when the Court held that the relevant knowledge requirement under the statute is the defendant's knowledge of the characteristics of his device. And because this statement does not show Speed lacked knowledge of the characteristics of his HIT devices, we find that the district court did not reversibly err in excluding the statement. Moreover, Speed conceded below that mistake of law is not a valid defense.

19

**3.**

Next, Speed appeals the district court's denial of his motion to dismiss the indictment based on his theory that, under the government's interpretation of the definition of a silencer, the NFA is unconstitutionally vague. A penal statute is unconstitutionally vague when it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).[11]

Speed insists that, under the government's interpretation, a number of everyday household objects could be used to suppress the sound of firing a gun. As a result, he maintains this interpretation would criminalize the possession of such items, rendering the statute unconstitutionally vague. We disagree.

It could be true that a plastic bottle, potato or other objects Speed mentions can suppress the report of a firearm.[12] But regardless of what else the NFA could cover, the HIT devices Speed possessed are "clearly proscribed" by the text of the statute. *United States v. Hasson*, 26 F.4th 610, 616 (4th Cir. 2022) (quoting *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010)). And when "a law clearly prohibits a defendant's conduct, the defendant cannot challenge, and a court cannot examine, whether the law may

---

[11] "We review vagueness challenges de novo." *United States v. Barronette*, 46 F.4th 177, 190 (4th Cir. 2022).

[12] At least in the movies, household objects have been used as silencers. In *The Godfather Part II*, for example, Vito Corleone creates a makeshift silencer by wrapping a towel around his gun. THE GODFATHER PART II (Paramount Pictures 1974).

be vague for other hypothetical defendants."[13] *Hasson*, 26 F.4th at 616–17 (quoting *United States v. Hosford*, 843 F.3d 161, 170 (4th Cir. 2016)). Thus, we affirm the district court's denial of Speed's motion to dismiss the indictment on vagueness grounds.[14]

**4.**

To sum up our discussion of the issues in bucket one of Speed's appeal, based on the text of the NFA's definition, we find that the district court accurately instructed the jury on the statutory definition of a silencer. Next, we find that, despite the devices he possessed being labeled as "solvent traps," there was sufficient evidence to convict Speed. Last, we reject Speed's argument that the NFA's definition is unconstitutionally vague as applied to him.

---

[13] Even so, it is not at all clear that the NFA covers the items Speed claims fall within its definition of a silencer. First, the definition only applies to devices. As just one example, a potato probably isn't a device. Second, the definition applies to devices "*for*" suppressing sound. § 921(a)(25) (emphasis added). The NFA definition may not cover items with objective features that fail to suggest a purpose of silencing a firearm, even if it is possible for someone to use them to suppress the sound of a firearm. *See Crooker*, 608 F.3d at 97 (specifically rejecting a reading of § 921(a)(25) based on whether an object is capable of silencing a firearm because that definition could apply to innocent household objects, including "a potato or a soda bottle"). Fortunately, since the HIT devices clearly fall within the NFA's definition of a silencer, we need not, and do not, define the outer contours of that definition.

[14] Speed also argues that ATF regulations and public guidance must be vague in that they do not give fair notice of what is criminalized. Though he provides no specific examples, he reaches this conclusion because he says his prosecution is not included within the scope of what is criminalized by the statute. But even if facts like his were not listed in those ATF regulations or public guidance, the statute would still clearly cover his conduct.

**B.**

We now turn to Speed's second bucket—his Second Amendment challenge. Speed argues that, even if his devices are silencers, his conviction is unconstitutional because the Second Amendment protects possession of silencers. For its part, the government agrees with Speed's assertion that silencers are protected by the Second Amendment. But the government, nevertheless, maintains that the NFA's regulation of silencers is constitutionally permissible.[15]

The Second Amendment declares, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court recognized that the Second Amendment codified a preexisting right for individuals to possess and carry arms. 554 U.S. 570, 592 (2008). The Court found that "arms" meant "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* at 581 (citation omitted). This extends "to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. However, the Court also left room for regulation and stated that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id.* at 625.

In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court established a two-step inquiry for assessing whether a regulation complies with the Second

---

[15] We review Speed's constitutional challenge de novo. *See United States v. Jacobs*, 166 F.4th 395, 398 (4th Cir. 2026).

Amendment. *See* 597 U.S. 1, 17 (2022). At *Bruen* step one, we are to look at whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 24. Though the Supreme Court did not explicitly say so in *Bruen*, the party challenging the regulation has the burden at step one. *See Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222–23 (4th Cir. 2024) (en banc), *cert. denied* 145 S. Ct. 1049 (2025). If the challenged conduct falls outside the Second Amendment's textual protection, the challenge fails. *Bianchi v. Brown*, 111 F.4th 438, 446 (4th Cir. 2024) (en banc), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025). "But if a court finds that the text *does* encapsulate the desired conduct, the analysis moves to the second step, where the burden shifts to the government to 'justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.* (quoting *Bruen*, 597 U.S. at 24).

With that background in mind, Speed must show that silencers are bearable arms under the text of the Second Amendment. We have not addressed this question in a published opinion. In an unreported opinion, we held that they are not. *United States v. Saleem*, No. 23-4693, 2024 WL 5084523, at *2 (4th Cir. Dec. 12, 2024) ("While a silencer may be a firearm accessory, it is not a 'bearable arm' that is capable of casting a bullet. Moreover, while silencers may serve a safety purpose to dampen sounds and protect the hearing of a firearm user or nearby bystanders, it fails to serve a core purpose in the arm's function."); *see also United States v. Simmons*, 143 F.4th 200, 207 (4th Cir. 2025) (identifying the question of whether silencers are protected by the Second Amendment but ultimately not reaching the question).

23

Only two other circuits have addressed whether silencers fall within the scope of the Second Amendment's protection. First, in *United States v. Cox*, the Tenth Circuit found silencers are not bearable arms. 906 F.3d 1170, 1186 (10th Cir. 2018). But that opinion pre-dated *Bruen*. Second, the Fifth Circuit initially held, in a post-*Bruen* opinion, that silencers are not bearable arms but subsequently withdrew that opinion. *See United States v. Peterson* (*Peterson I*), 127 F.4th 941, 946 (5th Cir. 2025), *withdrawn* (*Peterson II*), No. 24-30043, 2025 WL 1688717 (5th Cir. June 17, 2025), *and superseded* (*Peterson III*), 150 F.4th 644 (5th Cir. 2025), *withdrawn and superseded* (*Peterson IV*), 161 F.4th 305 (5th Cir. 2025), *withdrawn and superseded* (*Peterson V*), 161 F.4th 331 (5th Cir. 2025). When the Fifth Circuit reissued the opinion, it assumed without deciding that silencers are protected by the Second Amendment.[16] *Peterson V*, 161 F.4th at 339. Thus, neither of these cases are instructive.

Ultimately, we need not decide whether silencers are arms protected under the text of the Second Amendment. Even assuming they are, Speed's challenge fails for a separate reason—regulating arms through shall-issue licensing regimes is presumptively constitutional in the Fourth Circuit.

After *Bruen* found that a New York may-issue licensing regime violated the Second Amendment, we examined the constitutionality of a "shall issue" firearm permitting regime in *Maryland Shall Issue*, 116 F.4th at 220. Shall issue permitting jurisdictions are those in

---

[16] Speed filed his reply brief after the Fifth Circuit withdrew its decision in *Peterson I* and before the court reissued its opinion. Indeed, aside from *Bruen*, *Peterson* is the only case he cites in support of his Second Amendment argument in his reply brief. He incorrectly anticipated that, once reissued, the new opinion would help his case.

which "authorities *must* issue . . . licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability." *Bruen*, 597 U.S. at 13. These regimes "contain only 'narrow, objective, and definite standards' guiding licensing officials, rather than requiring the 'appraisal of facts, the exercise of judgment, and the formation of an opinion.'" *Id.* at 38 n.9 (citation omitted). In *Bruen*, the Supreme Court said in a footnote that such regimes "do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right." *Id.* But "because any permitting scheme can be put toward abusive ends, [the Court] d[id] not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right[s under the Second Amendment]." *Id.*

From this language, we interpreted *Bruen* to direct that shall-issue permitting requirements "are presumptively constitutional and generally do not 'infringe' the Second Amendment right to keep and bear arms under step one of the *Bruen* framework." *Md. Shall Issue*, 116 F.4th at 222. Thus, "if a [challenger] fails to rebut this presumption of constitutionality, the . . . challenge to the 'shall-issue' licensing law fails at step one, with no requirement to conduct a historical analysis under step two." *Id.* at 223.

The registration requirements in the NFA and related regulations provide objective criteria for the ATF to use in deciding whether to permit the transfer or manufacture of a silencer. *See* 26 U.S.C. §§ 5812(c), 5822; 27 C.F.R. §§ 479.62(b), 479.84(b); *see also* 28 C.F.R. § 0.131(c) ("*The Director of* [*ATF*] *shall* . . . [o]perate the National Firearms Licensing Center to review applications for firearms licenses; determine the eligibility of

25

applicants; *issue licenses on approved firearms applications*; coordinate with field offices the inspection of applicants and licensees; and maintain a firearms license database . . . ." (emphasis added)). They do not give the ATF discretion about whether to grant or deny a permit if the applicant complies with the regulatory requirements. Thus, the NFA creates a shall-issue permitting regime. *Peterson V*, 161 F.4th at 339; *see also Bruen*, 597 U.S. at 38 n.9.

As a result, these requirements are presumptively constitutional, and Speed bears the burden of overcoming that presumption by showing the regime was abusive. *See Md. Shall Issue*, 116 F.4th at 225–29. But Speed makes no effort to do so. Indeed, after arguing that silencers are bearable arms protected by the Second Amendment, he presents no argument whatsoever that the NFA's regulatory requirements violate the Constitution.

Thus, even if we assume, without deciding, that silencers are bearable arms under the Second Amendment, Speed's challenge still fails. By presenting no argument on the subject, Speed has simply not carried his burden of showing that the NFA's presumptively constitutional shall-issue permitting requirements are "so abusive as to 'infringe' the Second Amendment right under step one of the *Bruen* framework." *See Md. Shall Issue*, 116 F.4th at 229; *accord Peterson V*, 161 F.4th at 340.

**III.**

In conclusion, the devices Speed possessed meet the definition of a silencer under 18 U.S.C. § 921(a)(25). We find no error in the district court's jury instructions, we reject Speed's sufficiency of the evidence challenge and we hold the NFA's definition of silencers is not unconstitutionally vague as applied to him. Finally, we conclude that, even

26

if silencers are "bearable arms" under the Second Amendment, Speed has failed to present any argument that the NFA's shall-issue permitting regime is unconstitutional. For these reasons, the judgment of the district court is,

*AFFIRMED*.

27

WILKINSON, Circuit Judge, concurring:

The majority opinion ably explains why Speed's Second Amendment challenge fails. I join it in full. I write separately to share my view that Speed's challenge fails for an additional reason. The people's elected representatives may regulate silencers as they see fit because silencers are categorically unprotected by the Second Amendment.

**I.**

*Bruen* step one asks whether the object of a regulation is "cover[ed]" by "the Second Amendment's plain text." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). If the object is not covered by the text, then it falls outside the ambit of the Second Amendment, and the government may regulate it without "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17.

While the Amendment's text is unclear in some ways, it is plain in at least one: it protects the right to keep and bear "Arms." U.S. Const. amend. II. The Supreme Court has made clear that the term "Arms" means "[w]eapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008) (quoting dictionaries from 1771 and 1773). To the Founding generation, the quintessential arms were "muskets and sabers." *United States v. Rahimi*, 602 U.S. 680, 692 (2024).

Silencers do not fit this definition. They are neither weapons nor armor. "They cannot be fired or discharge projectiles." *United States v. Ritsema*, 31 F.3d 559, 562 (7th Cir. 1994). They cannot be worn for defense. And they are neither designed nor used by

anyone to cast at or strike another person. After all, "you can't hurt anybody with a silencer unless you hit them over the head with it." *United States v. Hasson*, No. GJH-19-96, 2019 WL 4573424, at \*2 (D. Md. Sep. 20, 2019).

Instead, silencers are better understood as firearm accessories. This is a designation the Framers would have understood. Many Founding-era sources distinguished "arms" from "accoutrements" and "ammunition." *See, e.g.*, 1785 Va. Acts 12; 1781 Del. Laws 3; 1778 N.J. Laws 45; 1786 N.Y. Laws 38–40; 1786 N.H. Laws 359–62. "[W]eapons themselves [were] referred to as 'arms,' and accessories of weaponry [were] referred to as 'accoutrements.'" *Duncan v. Bonta*, 133 F.4th 852, 867 (9th Cir. 2025) (en banc). "Common accoutrements included flint, scabbards, holsters, and ammunition containers such as cartridge cases and cartridge boxes." *Id.*; *see also, e.g.*, 1781 Del. Laws 3 (referring to "a Musket or Firelock with a Bayonet, a Cart[ridge]-Box . . ., a Priming-Wire, a Brush and six Flints" as "Arms and Accoutrements").

Like Founding-era accoutrements, silencers have little or no utility without being attached to or accompanied by arms. Even the appellant in this case cannot help but refer to them as "accessories," *see* Opening Br. at 48, 51, and every court of appeals to discuss the question has arrived at the same conclusion, *Duncan*, 133 F.4th at 867–68; *United States v. Saleem*, No. 23-4693, 2024 WL 5084523, at \*2 (4th Cir. Dec. 12, 2024); *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018); *see also United States v. Simmons*, 143 F.4th 200, 207 (4th Cir. 2025); *Ritsema*, 31 F.3d at 562. As mere accessories, silencers fall outside "the Second Amendment's plain text." *Bruen*, 597 U.S. at 24.

29

## II.

The government contends that some accessories—despite falling outside the Amendment's plain text—are protected at *Bruen* step one. It points to a decision long before *Bruen* in which the Supreme Court suggested that Second Amendment protection extends to some items that are not themselves "Arms." *United States v. Miller*, 307 U.S. 174, 180 (1939) ("The possession of arms also implied the possession of ammunition . . . .") (quoting 1 Herbert L. Osgood, *The American Colonies in the Seventeenth Century* 499 (1904))).

It is true, as a general matter, that "constitutional rights necessarily protect the prerequisites for their exercise." *Luis v. United States*, 578 U.S. 5, 25 (2016) (Thomas, J., concurring in the judgment). Without bullets, for example, "the right to bear arms would be meaningless." *Jackson v. City and Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

If this principle were extended too broadly, however, it would vitiate the Framers' careful choices about the scope of the rights they committed to text. They drafted and the people ratified an Amendment that protects "Arms," not "Arms and Accoutrements." For accoutrements or other accessories to receive protection under the Second Amendment, then, they must be necessary prerequisites to the right secured by the Amendment's plain text. The Sixth Circuit puts it well: the Amendment extends to those things "necessary to the effective exercise" of the right. *Oakland Tactical Supply, LLC v. Howell Twp.*, 103 F.4th 1186, 1193 (6th Cir. 2024). So does the Ninth: the Amendment only protects accessories "necessary to the ordinary operation" of a firearm. *Duncan*, 133 F.4th at 868.

30

Silencers fall well below this standard. Firearms are "useful and functional without a silencer attached, and a silencer is not a key item for the arm's upkeep and use like cleaning materials and bullets." *Saleem*, 2024 WL 5084523, at *2. Firearms were widely used before silencers were invented at the turn of the twentieth century, and they continue to be widely used without silencers today. Indeed, while Speed contends there are 2.6 million silencers in the United States, Opening Br. at 51, other estimates suggest the number of firearms is nearly 400 million, Sabrina Tavernise, *An Arms Race in America*, N.Y. Times (May 30, 2021). A silencer's function—muffling the report of a firearm—is wholly superfluous.

The government proposes a legal standard focused on utility rather than necessity, arguing that the Second Amendment should "extend[] to firearm accessories that are *useful* to the exercise of the right." Supp. Br. of the United States at 4 (emphasis added). But an unconstrained utility standard would remake the Second Amendment as we know it. A dizzying array of firearm accessories, including dangerous items far removed from the need for "individual self-defense" that is the Amendment's "central component," would be swept into its zone of protection. *Heller*, 554 U.S. at 599 (emphasis omitted).

Consider bump stocks. These firearm accessories can be described as "useful" insofar as their purpose is to increase the rate of fire of semiautomatic rifles. *Garland v. Cargill*, 602 U.S. 406, 411–13 (2024). But their effect can be devastating. By equipping his firearms with bump stocks, a shooter in Las Vegas was able to kill 58 people and wound 500 more in a matter of minutes. *Id.* Or consider armor-piercing ammunition, sometimes described as "cop-killer bullets." *Kodak v. Holder*, 342 F. App'x 907, 909 (4th Cir. 2009).

31

While armor-piercing ammunition may be useful to a firearm user in an abstract sense, its principal real-world effect is to severely increase the danger faced by law enforcement personnel. In an age defined by technological innovation, these treacherous accessories will soon be eclipsed by items even more lethal. The Framers would be surprised to learn that any of them was afforded constitutional protection.

What is true of bump stocks and armor-piercing ammunition is true of silencers. Utility alone cannot confer protection on a dangerous, unnecessary accessory. The Second Amendment does not extend that far.

## III.

The conclusion that silencers are unprotected by the Second Amendment suggests nothing about what types of silencer laws, if any, are best for society. It suggests only that the question properly belongs in the democratic process—where it has been for the last century—rather than the courts.

When the first silencer was patented in 1908, "[o]bjections to [its] civilian use . . . appeared almost immediately." Robert J. Spitzer, *Gun Accessories and the Second Amendment*, 83 Law & Contemp. Probs. 231, 246 (2020). *Scientific American* reported that its invention had "greatly enlarged the opportunities for the commission of undetected crime" and urged that "it should be made the subject of immediate and very stringent legislation." *The Menace of the Noiseless Gun*, 100 Sci. Am. 218, 218 (1909). Maine banned silencers that year, 1909 Me. Laws 141, and at least fourteen other states imposed restrictions of their own between 1909 and 1936, Spitzer, *supra*, at 248 & n.123. Congress followed suit when it placed a silencer registration requirement in the National Firearms

32

Act of 1934. The impression of many in that era was that silencers were part of "the arsenal of the 'public enemy,' the 'gangster.'" *People v. Brown*, 235 N.W. 245, 247 (Mich. 1931).

A century later, wholly legitimate reasons continue to motivate silencer restrictions. The sound of a gunshot is an essential and universally employed detection tool, both for police officers seeking out crime and for innocent victims and bystanders seeking to avoid it. That is true whether a police officer is patrolling the streets on foot or deploying modern acoustic detection technology. *See* Tatiana Schlossberg, *New York Police Begin Using ShotSpotter System to Detect Gunshots*, N.Y. Times (Mar. 16, 2015). The reduction in noise itself—the raison d'être of silencers—is what makes them so "dangerous and unusual." *United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009).

Criminals know this. In 2019, a mass shooter in Virginia Beach killed twelve people using a silencer that made his firearm "sound like 'a nail gun.'" Phil McCausland, *Virginia Beach Shooter Killed 12 Using Silencer and High-capacity Magazine. Now, Lawmakers Might Look at Both.*, NBC News (June 4, 2019). In 2023, a gunman in Monterey Park, California used a silencer-equipped firearm to kill eleven. Jeremy White & K.K. Rebecca Lai, *What We Know About the Gun Used in the Monterey Park Shooting*, N.Y. Times (Jan. 26, 2023); Victoria Kim, *All of the Victims of the Monterey Park Shooting Have Now Been Identified*, N.Y. Times (Jan. 25, 2023). So did the man who murdered UnitedHealthcare's CEO in broad daylight in 2024. Corey Kilgannon, *Pistol Taken from Suspect Was a Fully Homemade Weapon, Officials Say*, N.Y. Times (Dec. 10, 2024).

In fact, we need look no further than this case. As the majority recounts, Speed himself amassed a collection of silencers as part of his plan to "wipe out the opposition and

33

leave the entire country free" of them. J.A. 1235. He hoped to find "[p]eople who don't have bodyguards" and "[p]eople who don't have intel organizations helping them out," and then conduct a "mock trial" to decide which of them to add to "the list." *Id.* 1231–32. He thought his silencers would "come in handy at that point." *Id.*

In the face of this evidence, it is not hard to see why lawmakers have concluded that access to silencers should be circumscribed.

Speed asks us to focus on the fact that silencers help "lawful firearms users" by "protecting [their] hearing." Opening Br. at 50. Speed is assuredly right that they confer some hearing-related benefits. But these benefits are nothing more than one factor among many to be considered by the people and their elected representatives. If Congress or a state legislature concludes that the risks to law enforcement outweigh the hearing benefits to lawful firearm users, it is not up to a court to tell them otherwise. To do so would be to sideline the democratic process without justification in constitutional text or principle.

Judge Quattlebaum's opinion rightly concludes that the minimal burden imposed by Congress's shall-issue silencer registration requirement is constitutional. In my view, however, Congress's requirement would remain constitutional even if it was a broader one. When it comes to silencers, as with so many other subjects of present-day controversy, we must trust democracy.

34

RICHARDSON, Circuit Judge, concurring:

Circuit precedent binds me, so I concur in the Court's rejection of Speed's Second Amendment challenge. But the precedent we apply cannot be squared with *Bruen* or the Second Amendment's text, and I write to reiterate why.

All Second Amendment claims must be assessed under *Bruen*'s text-and-history framework. Majority Op. at 22–23; *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 24 (2022); *see also United States v. Rahimi*, 602 U.S. 680, 691 (2024). At step one, we've correctly assumed that suppressors fall within the scope of the Second Amendment's plain text. Majority Op. at 24. But rather than proceeding directly to history and tradition, we stop because Speed failed to show that the National Firearms Act suppressor-licensing scheme was "abusive." Why? Because our Court requires challengers to show that a shall-issue regime that burdens the right to keep and bear arms is "particularly abusive" to establish a *prima facie* case for Second Amendment protection. *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 240 (4th Cir. 2024) (Richardson, J., dissenting).

Although this half-step between steps one and two is the binding precedent of this circuit, it disregards both the Second Amendment's plain text and Supreme Court precedent. Indeed, it flips *Bruen*'s two-step on its head: The Supreme Court has repeatedly clarified that when the government so much as "regulates arms-bearing conduct, . . . it bears the burden to justify its regulation." *Rahimi*, 602 U.S. at 691 (cleaned up); *see also Maryland Shall Issue*, 116 F.4th at 244 (Richardson, J., dissenting). This circuit's half-step also lets a judge's assessment of a law's "abusiveness" cut the analysis short by reviving the very interest balancing that *Bruen* rejected.

35

This error springs from the en banc Court's misreading of *Bruen*'s footnote 9. *See id.* at 242–43; *cf. United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 755 n.6 (2023) (cautioning against "read[ing] a footnote" to "establish the general rule" for a class of cases); *Rahimi*, 602 U.S. at 701–02 (rejecting lower courts' expansion of the "responsible" citizens dicta from *Heller* and *Bruen* and emphasizing that "such a line [did not] derive from our case law," since "[t]he question was simply not presented" in prior cases). But footnote 9 did not make shall-issue regimes presumptively constitutional. It clarified only that they were not necessarily unconstitutional, unlike the more burdensome may-issue regime the Supreme Court considered. *See Bruen*, 597 U.S. at 38 n.9. Nowhere does it give courts free rein to assess the degree of burden at the plain-text stage. *See Maryland Shall Issue*, 116 F.4th at 241–42 (Richardson, J., dissenting). The Court warned only against importing *Bruen*'s outcome wholesale to different regimes. It left open that, at step two, the government might identify historical regulations imposing a comparable burden to a shall-issue regime. But where a regime burdens the right *at all*, we must proceed to the second step. That no historical tradition justified the more onerous burden did not foreclose that *some* tradition might justify a lesser one.

Though we have no choice but to follow this circuit's aberrant framework, I remain hopeful that we will one day assess firearm regulations against history and tradition. For now, we've given the government a free pass to erode protected conduct in ways inconsistent with our Nation's historical tradition, so long as it does so . . . nicely?

36